# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2019

Lyle W. Cayce
Clerk

No. 17-50518

DOCTOR JOSEPH A. ZADEH; JANE DOE, Patient,

      Plaintiffs - Appellants

v.

MARI ROBINSON, in her individual capacity and in her official capacity; SHARON PEASE, in her individual capacity; KARA KIRBY, in her individual capacity,

      Defendants – Appellees

Appeals from the United States District Court
for the Western District of Texas

ON PETITION FOR REHEARING EN BANC

Before JOLLY, SOUTHWICK, and WILLETT, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

No member of the panel nor judge in regular active service requested that the court be polled on rehearing en banc. The petition for rehearing en banc is therefore DENIED. *See* FED. R. APP. P. and 5th Cir. R. 35. Treating the petition for rehearing en banc as a petition for panel rehearing, the petition is GRANTED. We withdraw our prior opinion, *Zadeh v. Robinson*, 902 F.3d 483 (5th Cir. 2018), and substitute the following.

No. 17-50518

The Texas Medical Board executed an administrative subpoena on Dr. Joseph Zadeh's medical office.  Thereafter, Dr. Zadeh and one of his patients sued several Board members under 42 U.S.C. § 1983, claiming that the Board's actions violated the Fourth Amendment.  The district court partially granted the defendants' motion to dismiss and later granted their motion for summary judgment rejecting all remaining claims.  We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Dr. Joseph Zadeh appeals the dismissal of his Section 1983 claim against several members of the Texas Medical Board who he claims violated his constitutional rights through a warrantless search of his office and medical records.  Dr. Zadeh, an internal medicine doctor, owns and operates a medical practice in Euless, Texas.  One of his patients, Jane Doe, is also a plaintiff-appellant in this case.

Dr. Zadeh was the subject of an administrative proceeding before the State Office of Administrative Hearings ("SOAH") for violations of the Board's regulations.  The Drug Enforcement Agency ("DEA") also was investigating him.  Indeed, it appears the Board first learned about allegations against Dr. Zadeh when the DEA filed a complaint with the Board about his prescribing practices in September 2013.  The DEA investigator emailed a representative of the Board, stating, "I'm at a point in the criminal case that I need to interview Dr. Zadeh and review his patient files."  The Board then initiated an investigation.

As part of this investigation, Defendants Sharon Pease and Kara Kirby, who were investigators with the Board, served an administrative subpoena on Dr. Zadeh on October 22, 2013.  The subpoena had the electronic signature of Defendant Mari Robinson, who was the Executive Director of the Board.  The

subpoena was for the immediate production of the medical records of sixteen of Dr. Zadeh's patients.  Two DEA agents who were investigating related criminal allegations accompanied Kirby and Pease.

The district court found the "facts surrounding the execution of the subpoena" to be "largely undisputed."  Dr. Zadeh was not present when the investigators arrived. The subpoena was handed to the doctor's assistant.  The investigators sat in the medical office waiting room to give the doctor time to appear.  While they waited, the assistant spoke on the phone with Dr. Zadeh, his lawyer, and his brother who also is a lawyer.  The assistant testified that after these calls had occurred but no permission to proceed had been given, the investigators told her they would suspend Dr. Zadeh's license if the records they sought were not produced.  The investigators admit something was said that was akin to a promise of some vague "disciplinary action."  What was said at that point is at least unclear.  The assistant eventually complied, taking the defendants into a conference room and delivering the requested records to them.  Although most of their time was spent inside the public waiting area or conference room, the investigators also approached the medical assistant to ask for help while she was in exam rooms and later in a storage room.

As a result of that search, Dr. Zadeh and his patient, Jane Doe, sued Robinson, Pease, and Kirby in their individual capacities and Robinson in her official capacity in the United States District Court for the Western District of Texas. They alleged the defendants' actions violated their Fourth Amendment, due process, and privacy rights.  The plaintiffs sought monetary damages under 42 U.S.C. § 1983 as well as declaratory relief.  The defendants moved to dismiss the claims on these grounds: (1) the plaintiffs lacked standing; (2) the *Younger* abstention doctrine barred the requests for declaratory relief; (3) the claim against Robinson in her official capacity was barred by the doctrine of

sovereign immunity; (4) the doctrine of qualified immunity applied to the claims against the defendants in their individual capacities.

In ruling on the motion to dismiss, the district court held Dr. Zadeh had standing to pursue declaratory relief, but Jane Doe did not. Nonetheless, the district court concluded that "the *Younger* abstention doctrine require[d] [it] to abstain from adjudicating Plaintiff Zadeh's claims for declaratory relief." The district court also held that sovereign immunity barred the plaintiffs' claims for monetary damages against Robinson in her official capacity. Finally, the court concluded that the defendants were entitled to qualified immunity for the privacy and due process claims. The only part of the suit left, then, was Dr. Zadeh's claim that the defendants violated his clearly established Fourth Amendment rights during the search of his office.

The defendants moved for summary judgment on "whether Defendants exceeded their statutory subpoena authority by searching and inspecting Plaintiff's office and records." Although the plaintiffs alleged that the investigators performed a thorough search of Dr. Zadeh's office, the district court found that the record did not support this allegation. Instead, the district court determined that the "Defendants' presence at Plaintiff's office was solely to execute the subpoena instanter." The district court also held that Robinson was not liable as she neither affirmatively participated in the alleged search nor implemented unconstitutional policies that caused the alleged constitutional deprivation. Further, there was "no evidence Defendants Pease and Kirby inspected Plaintiff's office or searched his records." The plaintiffs timely appealed.

No. 17-50518

DISCUSSION

The plaintiffs appeal both the order granting the motion to dismiss in part and the order granting the motion for summary judgment. Although we review both *de novo*, a different legal standard applies to each:

> In the former, the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. In the latter, we go beyond the pleadings to determine whether there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

*St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 n.8 (5th Cir. 2000) (citations omitted).

We first address the plaintiffs' challenge to the district court's grant of qualified immunity, evaluating whether clearly established law prohibited the defendants' conduct. Next, we discuss whether the district court erred in abstaining from deciding the plaintiffs' claims for declaratory judgment. Finally, we analyze whether Robinson was liable in her supervisory capacity.

## I.    *Grant of qualified immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370–71 (5th Cir. 2011). Officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Using this framework, we analyze the plaintiffs' arguments that clearly established law prohibited the defendants' execution of the subpoena instanter. The plaintiffs offer two theories for why the defendants' conduct

was unconstitutional.  First, they argue it was a warrantless search that did not satisfy the administrative exception.  Second, they argue it was a pretextual search and thus unconstitutional.

### a.    *Warrantless search*

The plaintiffs argue the Board violated the Fourth Amendment when it demanded immediate compliance with its administrative subpoena.  We have previously considered a challenge to a subpoena instanter executed by the Texas Medical Board.  *See Cotropia v. Chapman*, 721 F. App'x 354 (5th Cir. 2018).  In that nonprecedential opinion, we held: "Absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker."  *Id.* at 358 (quoting *City of Los Angeles v. Patel*, 135 S. Ct. 2243, 2452 (2015)).

In that case, the physician at the center of a Board investigation pled sufficient facts to overcome qualified immunity.  *Id.* at 361.  The doctor alleged that a Board member "violated the clearly established right to an opportunity to obtain precompliance review of an administrative subpoena before a neutral decisionmaker" when he took documents from the physician's office over objections from the office receptionist.  *Id.* at 357.  Relying on Supreme Court precedent, we held that it was clear at the time that "prior to compliance, Cotropia was entitled to an opportunity to obtain review of the administrative subpoena before a neutral decisionmaker."  *Id.* at 358 (citing *See v. City of Seattle*, 387 U.S. 541, 545 (1967); *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984)).  Similarly, the demand to turn over Dr. Zadeh's medical records immediately did not provide an opportunity for precompliance review.  We agree, then, that a requirement of precompliance review in many, if not most,

administrative searches had been clearly established by Supreme Court precedent prior to the search here.

The defendants acknowledge this law but maintain there was no constitutional violation because this search fell into an exception to the general rule requiring precompliance review.  We next examine that argument.

### i.    *Closely regulated industry*

No opportunity for precompliance review is needed for administrative searches of industries that "have such a history of government oversight that no reasonable expectation of privacy" exists for individuals engaging in that industry.  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).  Even so, warrantless inspections in closely regulated industries must still satisfy three criteria: (1) a substantial government interest, (2) a regulatory scheme that requires warrantless searches to further the government interest, and (3) "a constitutionally adequate substitute for a warrant."  *New York v. Burger*, 482 U.S. 691, 702–03 (1987) (quoting *Donovan v. Dewey*, 452 U.S. 594, 603 (1981)).

*Cotropia* did not resolve whether the Board's use of administrative subpoenas satisfied the *Burger* criteria because the issue was not raised until oral argument.  *Cotropia*, 721 F. App'x at 360 & n.6.  As a result, the panel's holding was expressly limited to concluding that the Board's demand for immediate compliance with the subpoena did not satisfy the general administrative exception to the warrant requirement.  The argument has timely been raised here, though.  Thus, we must discuss whether the *Burger* exception permitted the Board's administrative subpoena and whether that law was clearly established at the time of its execution.

To categorize industries under *Burger*, courts consider the history of warrantless searches in the industry, how extensive the regulatory scheme is,

No. 17-50518

whether other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated. *See Burger*, 482 U.S. at 704; *Patel*, 135 S. Ct. at 2454. The defendants characterize the relevant industry in two different ways. We evaluate first whether the practice of medicine is a closely regulated industry and then whether the practice of prescribing controlled substances is closely regulated.

Acknowledging that the medical profession is subject to close oversight, the district court emphasized the absence of a history of warrantless inspections to conclude that the medical profession was not a closely regulated industry. Important to its conclusion was the confidential nature of the doctor-patient relationship: "It strains credibility to suggest that doctors and their patients have no reasonable expectation of privacy." On appeal, the defendants all but concede that there is not a lengthy history of warrantless searches. They instead emphasize the extensive regulatory scheme governing the practice of medicine and the risk that the industry could pose to the public welfare.

There is no doubt that the medical profession is extensively regulated and has licensure requirements. Satisfying the *Burger* doctrine requires more. The Supreme Court instructs "that the doctrine is essentially defined by 'the pervasiveness and regularity of the federal regulation' and the effect of such regulation upon an owner's expectation of privacy." *Burger*, 482 U.S. at 701 (quoting *Dewey*, 452 U.S. at 605–06). Another key factor is "the duration of a particular regulatory scheme." *Id.* (quoting *Dewey*, 452 U.S. at 606).

The Board cites several laws or regulations governing the behavior of doctors. Outside of citing Texas's licensure requirement for physicians, the regulations the Board cites do not apply to the entire medical profession. Instead, they target the practice of prescribing controlled substances. As

8

examples, the Board states that doctors must register with the DEA to prescribe controlled substances, TEX. HEALTH & SAFETY CODE § 481.061; that prescriptions of controlled substances are monitored by several law enforcement agencies, *id.* §§ 481.067, 481.075, 481.076; and that pain management clinics must register as such, which allows the Board to inspect them from time to time, TEX. OCC. CODE §§ 168.101, 168.052; 37 Tex. Reg. 10079, 10079–80 (2012), *adopted* 38 Tex. Reg. 1876, 1876–77 (2013), *amended* 39 Tex. Reg. 297, 297–98 (2014) (former 22 TEX. ADMIN. CODE § 195.2); 35 Tex. Reg. 1924, 1925–26 (2010), *adopted* 35 Tex. Reg. 3281, 3281–82 (2010), *amended* 43 Tex. Reg. 768, 768–74 (2018) (former 22 TEX. ADMIN. CODE § 195.3).  The Board also refers us to laws and regulations that similarly regulate anesthesia.  These, though, do not amount to pervasiveness and regularity of regulation over the medical industry as a whole as *Burger* requires.  Instead, only specific groups of doctors may have been put on notice that the Board may perform some inspections.

We also do not see in the medical profession an entrenched history of warrantless searches.  Its absence is relevant, though not dispositive, to our issue.  *Burger*, 482 U.S. at 701.  For example, when the Court held that the liquor industry was closely regulated, it mentioned that English commissioners could inspect brewing houses on demand in the 1660s, and that Massachusetts passed a similar law in 1692.  *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75 (1970).  It then referred to a 1791 federal law that has continued in various forms, permitting federal officers to perform warrantless searches of distilleries and imposing an excise tax on distilled liquor.  *Id.*  Because the focus there was "the liquor industry long subject to close supervision and inspection," the Court concluded that the Fourth

Amendment did not prohibit the warrantless searches authorized by Congress. *Id.* at 77. Here, there is no such history.

In considering the reasonable expectation of privacy, we also consider the sensitive nature of medical records. The Ninth Circuit explained that "the theory behind the closely regulated industry exception is that persons engaging in such industries, and persons present in those workplaces, have a diminished expectation of privacy." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004). We agree with that court's observation that in medical contexts, the expectation of privacy likely is heightened. *Id.*

Admittedly, federal regulations do exempt the Board from the privacy requirements of the Health Insurance Portability and Accountability Act ("HIPAA"). 45 C.F.R. § 164.512. Further, the Board cites Texas laws providing that where the Board does obtain information, it is subject to confidentiality requirements. *See* TEX. OCC. CODE §§ 159.002; 159.003(a)(5); 164.007(c). That HIPAA permits disclosure to the Board and that the regulations governing the Board continue to protect that information from disclosure does not mean that the Board is entitled to access to that information through an administrative search without allowing an opportunity for precompliance review.

We conclude, then, that the medical industry as a whole is not a closely regulated industry for purposes of *Burger*. Still, even if the medical profession at large cannot be said to fall within these *Burger* factors, it is possible that a subset, such as those who prescribe controlled substances, would do so. Because the parties focus their analysis of whether there is a closely regulated industry on the medical profession as a whole and not on pain management clinics, we assume only for purposes of our analysis today that pain management clinics are part of a closely regulated industry and that Dr. Zadeh was operating such a clinic even if his clinic was not certified as one. Such

assumptions are appropriate in this case because ultimately our resolution turns on whether the relevant law was clearly established. At this point, we can at least say that the law was not clearly established whether pain management clinics are part of a closely regulated industry. The remaining relevant law, established with clarity or not, is analyzed below.

### ii.    Burger *exception requirements*

Even were we to accept the defendants' argument that doctors prescribing controlled substances are engaging in a closely regulated industry with less reasonable expectations of privacy, administrative searches of such industries still must satisfy the three *Burger* criteria. There is no meaningful dispute in this case as to the first two factors, namely, that the State has a substantial interest in regulating the prescription of controlled substances and that the inspection of a doctor's records would aid the Government in regulating the industry. We thus analyze only whether the statutory scheme is a proper substitute for a search warrant. The Board relies on its authority to issues subpoenas and to inspect pain management clinics. The principal response from plaintiffs is that neither provides a constitutionally adequate substitute for a warrant.

In order for a warrant substitute authorized by statute to be constitutionally adequate, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. The relevant statute provides: "The board may issue a subpoena or a subpoena duces tecum to compel the attendance of a witness and the production of books, records, and documents." TEX. OCC. CODE. § 153.007(a).

No. 17-50518

The Board argues that the statute, when considered with the following regulation, limits the discretion of the officials.  The regulation provides that after a "request by the board or board representatives, a licensee shall furnish to the board copies of medical records or the original records within a reasonable time period, as prescribed at the time of the request."  22 TEX. ADMIN. CODE § 179.4(a).  The regulation defines "reasonable time" as "fourteen calendar days or a shorter time if required by the urgency of the situation or the possibility that the records may be lost, damaged, or destroyed." *Id.*

The district court held that a search using the Board's subpoena authority did not satisfy the third factor of the *Burger* test as it was "purely discretionary," allowing the Board "to choose which doctors to subpoena and to do so at a frequency it determines."  To evaluate that holding, we consider the limits that do exist: only licensees are subject to the subpoena; only medical records must be produced; and it is the Board or its representatives who will be asking for the records.  As the district court stated, though, there is no identifiable limit on whose records can properly be subpoenaed.

As to inspections of pain management clinics, the Board argues that some limits to its authority are set by the statute permitting it to inspect pain management clinics.  Specifically, the statute allows it to examine "the documents of a physician practicing at the clinic, as necessary to ensure compliance with this chapter."  TEX. OCC. CODE. § 168.052(a).  Providing more specific guidance, the regulation in effect at the time provided:

> The board may conduct inspections to enforce these rules, including inspections of a pain management clinic and of documents of a physician's practice. The board may contract with another state agency or qualified person to conduct these inspections.

No. 17-50518

35 Tex. Reg. 1925, 1925–26 (2010), *adopted* 35 Tex. Reg. 3281, 3281–82 (2010), *amended* 43 Tex. Reg. 768, 768–74 (2018) (former 22 TEX. ADMIN. CODE § 195.3).

The district court found this inspection authority, like the subpoena authority, to be "purely discretionary." The governing criteria for an inspection is that the target be a pain management clinic, that the Board performs the inspection, and that the purpose for the search be to determine compliance with pain management rules. We agree with the district court, though, that these requirements suffered from the same fatal *Burger* flaw as the subpoena authority: they did not limit how the clinics inspected are chosen.

In summary, there are insufficient limits on the discretion of the Board to satisfy the *Burger* requirements, whether considering the medical profession in general or as to pain management clinics. What is left is the question of whether the law on these points was clearly established and, regardless, whether the search was invalid as pretextual.

### iii.    Clearly established law for qualified immunity

To summarize, we have concluded there was a violation of Dr. Zadeh's constitutional rights. That is true even with our twin assumptions that pain management clinics are part of a closely regulated industry and that Dr. Zadeh operated a pain management clinic. Nonetheless, the defendants are entitled to qualified immunity unless the constitutional requirements they violated were clearly established at the time of their actions. *Reichle*, 566 U.S. at 664. We hold that it was clearly established at the time of this search that the medical profession as a whole is not a closely regulated industry, meaning that governmental agents violate the Constitution when they search clinics that are not pain management clinics without providing an opportunity for

13

precompliance review. We also hold, even assuming that pain management clinics are part of a closely regulated industry, that on-demand searches of those clinics violate the constitution when the statutory scheme authorizing the search fails to provide sufficient constraints on the discretion of the inspecting officers. We need to analyze, though, whether that last statement of law was clearly established when this search occurred.

Our analysis of the clarity of relevant law is objective, meaning it does not focus on the specific defendants' knowledge. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). "[E]ven law enforcement officials who 'reasonably but mistakenly [commit a constitutional violation]' are entitled to immunity." *Glenn v. City of Tyler*, 242 F.3d 307, 312–13 (5th Cir. 2001) (quoting *Goodson*, 202 F.3d at 736). For the law to be clearly established, there must be a close congruence of the facts in the precedent and those in the case before us. *Wesby*, 138 S. Ct. at 589–90. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiffs seek to apply." *Id.* at 590.

Defendants rely on one of our precedents that reviewed an administrative search of a dentist's office by agents of the Texas State Board of Dental Examiners, accompanied by Department of Public Safety officials. *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 632 (5th Cir. 2000). Dentist Beck was a target because of complaints filed against him for prescribing controlled substances. *Id.* We concluded that the search did not violate the plaintiff's clearly established rights. *Id.* at 638–39. We applied the *Burger* exception and determined there was a significant state interest in

14

regulating dentists' use of controlled substances; the search was conducted pursuant to two regulatory schemes; and there was an adequate substitute for a warrant where the statute permitted the official to conduct inspections during "reasonable times" after "stating his purpose" and presenting his credentials to the owner. *Id.* at 638–39. In light of *Beck*, the Board argues that reasonable investigators could have believed the *Burger* exception permitted the execution of the subpoena as they too were investigating prescriptions of controlled substances within the medical industry.

The plaintiffs insist that *Beck* is "patently distinguishable" for the same reason argued in the separate opinion here. The clarity of any possible distinction, though, must be viewed through the lens that the law, including a distinction, must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful" at that time. *Wesby*, 138 S. Ct. at 589 (quotation marks omitted). That means "existing law must have placed the constitutionality of the officer's conduct 'beyond debate." *Id.* Perhaps most relevant, the "legal principle [must] clearly prohibit the officer's conduct *in the particular circumstances before him*. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (emphasis added).

The claimed sufficient distinction here is that the regulations and statutes under which the investigators in *Beck* acted explicitly permitted inspections without prior notice. *See Beck*, 204 F.3d at 639. The *Beck* court discussed that point at the end of the opinion, as it addressed several questions regarding whether what occurred was a valid administrative search of a closely regulated industry. *Id.* The final subject the court discussed was that one of the statutes under which the inspection was conducted did not require that prior notice be given. *Id.* (quoting Section 5.01(c) of the Texas Controlled

No. 17-50518

Substances Act.)  That is no small distinction, and we conclude today that absent similar statutory or perhaps regulatory authority that dispenses with prior notice, a search such as occurred here cannot be conducted without prior notice.  The issue for us, though, is whether that law was clearly established at the time of the search we are reviewing today.

As we already stated, the right is not clearly established unless it is beyond debate using an objective test.  We have discussed the intricacies of *New York v. Burger*, which permit warrantless searches when they satisfy a three-factor test.  Our *Beck* decision held that the search there was of a closely regulated industry, and therefore went through the three *Burger* factors.  The discussion of the specific statutory authorization for no-notice inspections was to show that the third *Burger* factor was satisfied, which is that an adequate substitute for a warrant existed.  We did not say in *Beck* that the only sufficient substitute under *Burger* was a statute authorizing no-notice searches.  We did hold that "under these circumstances, Beck does not show a violation of a clearly established constitutional right." *Beck*, 204 F.3d at 639.

Instead of clearly establishing the principle that prior notice of a regulatory search must be given unless the authorizing statute explicitly announces it is unnecessary, *Beck* applied the general *Burger* principle to the facts of that case that a warrant substitute authorized by a "regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703.  In the *Beck* situation, that factor was satisfied with the statutory language already discussed.  We cannot see, though, that every reasonable official prior to conducting a search under the circumstances of this case would know this *Burger* factor was not satisfied.  We

16

think some, even many, reasonable officers would believe under the third *Burger* factor that the owner of the premises was charged with knowledge that a statute authorized the search, and the officers would reasonably believe the scope of the search and the discretion of the officials was validly limited. We have held that the statute fails this standard, but we do not hold that all reasonable officers would have known that, until now.

Therefore, although *Beck* does not control the constitutionality of the Board's actions in this case, it does weigh in favor of the defendants' receiving qualified immunity. We find more guidance from cases where a statute did not clearly limit the official's discretion in selecting who would be subject to an administrative search. In one, we held that the statute provided a constitutionally adequate substitute for a warrant where the statute provided:

> The licensing agency shall make or cause to be made inspections relative to compliance with the laws and regulations governing the licensure of child care facilities. Such inspections shall be made at least once a year but additional inspections may be made as often as deemed necessary by the licensing agency.

*See Ellis v. Miss. Dep't of Health*, 344 F. App'x 43 (5th Cir. 2009) (citing MISS. CODE. ANN. § 43-20-15). Though that opinion is not precedential, we agree with its reasoning.

We also upheld an administrative search where, despite limits on the conduct of an officer after a traffic stop, there were not clear limits on an officer's discretion as to whom to stop. *See United States v. Fort*, 248 F.3d 475, 482 (5th Cir. 2001). Because we have not so far required there to be a clear limit on determining whom officials select for an administrative search, the defendants reasonably could have believed that the administrative scheme here provided a constitutionally adequate substitute for a warrant.

No. 17-50518

Finally, the plaintiffs argue that even if qualified immunity might apply to defendants who conducted a proper search, the defendants did not follow the statutory scheme.    Therefore, they assert, caselaw in which the legal requirements for the search were followed is inapplicable.    The claims of overstepping authority, though, are minor.    First, while the medical assistant was waiting for Dr. Zadeh to appear, there is evidence one of the investigators approached the assistant at her desk, then followed her into two exam rooms. While in one of the rooms, the investigator asked if controlled substances were kept in the room.    Second, there is evidence this same investigator also approached the assistant while the latter was in a storage room and asked if the investigators could use the medical office's copy machine.    The district court said there was no evidence the investigator ever looked at any files or went somewhere in the medical office without the assistant.    Finally, as soon as the investigators were asked to leave the office, they did so.    We agree with the district court that there is "no support in the record" to sustain the allegation the investigators did a "thorough search and inspection."    The factual basis for deviations from search protocols is insubstantial.

In conclusion, the unlawfulness of the defendants' conduct was not clearly established at the time of the search.

### b.    *Pretextual searches*

The plaintiffs also argue that the search was a pretext for uncovering evidence of criminal wrongdoing, not a valid administrative search. According to the plaintiffs, the DEA brought Dr. Zadeh's possible misdeeds before the Medical Board.  A DEA agent then was present during the search.  To finish the story, though, the Medical Board proceeded against Dr. Zadeh.    Before there was a full hearing on the merits, the Board entered an agreed order.  In

the order, the panel found that Dr. Zadeh was operating a pain management clinic without registering it. There is nothing in this record indicating whether the DEA's investigation resulted in a criminal prosecution or any other action.

"Even under a valid inspection regime, the administrative search cannot be pretextual." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 197 (5th Cir. 2009). It is incorrect, though, to use the label "pretext" simply because of an overlap between an administrative search and a criminal search. The *Burger* Court remarked that "a State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions." *Burger*, 482 U.S. at 712. To determine whether the search there was constitutional, the Court looked to whether the administrative scheme really "authorize[d] searches undertaken solely to uncover evidence of criminality." *Id.*

Similarly, the Supreme Court dismissed a defendant's argument "that because the Customs officers were accompanied by a Louisiana State Policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marijuana," the Government could not rely on the administrative search exception. *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983).

We have applied these principles to a search of an automobile salvage yard. *United States v. Thomas*, 973 F.2d 1152, 1155–56 (5th Cir. 1992). There, an investigator with the Texas Department of Public Safety tracked a vehicle to an auto salvage business and there conducted an inventory inspection under Texas statute. *Id.* at 1155. Even though the inventory inspection was prompted by suspicion of criminal conduct, the investigator still was entitled to use information gained during the inspection to obtain a search warrant for the salvage-yard owner's residence. *Id.* "Administrative searches conducted

pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing." *Id.* at 1155–56.

*Beck* has similar analysis. As here, the administrative search in *Beck* was initiated after a tip. Dental Board member Michael Pitcock "stated in his deposition that information was forwarded to him alleging that Beck had ordered unusually high volumes of controlled substances." *Beck*, 204 F.3d at 632. The Dental Board suspected Beck of violating criminal statutes, and a law enforcement officer accompanied the board agent in its inspection of the dental office. *Id.* The dentist argued that the search was conducted to uncover criminal wrongdoing and thus was not conducted pursuant to a valid administrative scheme. *Id.* at 638. We held that the suspicions of criminal wrongdoing "did not render the administrative search unreasonable," citing *Villamonte-Marquez* and *Thomas. Id.* at 639.

As to Dr. Zadeh, the DEA was closely involved with the Board's investigation. Under *Burger*, though, we look to whether the search that occurred was under a scheme serving an administrative purpose. The Board's purpose is demonstrated by the subsequent administrative action against Dr. Zadeh. The search was not performed "solely to uncover evidence of criminality." *See Burger*, 482 U.S. at 698. Thus, the search was not pretextual.

## II.    *Declaratory Judgment*

Dr. Zadeh argues that the district court erred in abstaining from deciding the declaratory judgment claims following *Younger*. Dr. Zadeh asked the district court to make declaratory judgments on several laws implicating the Board. The district court did not resolve any.

"In *Younger*, the Supreme Court 'instructed federal courts that the principles of equity, comity, and federalism in certain circumstances counsel

abstention in deference to ongoing state proceedings.'" *Wightman v. Tex. Supreme Court*, 84 F.3d 188, 189 (5th Cir. 1996) (citations omitted).  Following Supreme Court precedent, this court follows "a three-part test describing the circumstances under which abstention [is] advised: (1) the dispute should involve an 'ongoing state judicial proceeding;' (2) the state must have an important interest in regulating the subject matter of the claim; and (3) there should be an 'adequate opportunity in the state proceedings to raise constitutional challenges.'" *Id.* (citation omitted).

The district court applied the reasoning of one of our unpublished cases, *Perez v. Tex. Med. Bd.*, 556 F. App'x 341 (5th Cir. 2014).  There, we held that *Younger* barred the plaintiffs' suit seeking to enjoin the Board from pursuing any causes of action against them.  *Id.* at 342–43.  We agree with that panel's determination that Texas had a strong interest in regulating the practice of medicine, and the *Perez* plaintiffs could raise their constitutional challenges in the state court because the law provided for judicial review of the administrative decision.  *Id.* at 342.  Following *Perez*, the district court concluded that Dr. Zadeh had an ongoing administrative action pending; the state had a significant interest in regulating medicine in Texas; and Dr. Zadeh could appeal his administrative action in state court and raise constitutional challenges there.  Accordingly, the district court abstained from adjudicating the requests for declaratory relief.

Dr. Zadeh claims *Younger* is inapplicable because the Board argued that the lawsuit did not implicate the underlying investigation.  Dr. Zadeh also argues that there will be no adequate opportunity in the state proceedings to raise any constitutional challenges.  He claims that "[d]octors do not have the power to file an appeal concerning the findings of fact and conclusions of law contained in a final decision (but the TMB does)."

No. 17-50518

Dr. Zadeh was subject to an ongoing state administrative proceeding, and that qualifies as a judicial proceeding for this analysis. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). As we stated in *Perez*, Texas has a strong interest in regulating the practice of medicine. Finally, despite plaintiffs' contrary view, Texas law does permit judicial review by either party of an administrative decision.[1] "A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." TEX. GOV'T CODE. § 2001.171.

The district court did not abuse its discretion in abstaining from deciding the declaratory judgment claims.

## III.    *Director Robinson's potential supervisory capacity liability*

The plaintiffs argue that Robinson should be held liable in her supervisory capacity. "A supervisory official may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). A failure to train claim requires that the plaintiff show (1) the supervisor's failure to train; (2) the failure to train resulted in the violation of the plaintiff's rights; and (3) the failure to train shows deliberate indifference. *Id.* For deliberate indifference, "there must be 'actual or constructive notice' 'that a particular omission in their training

---

[1] The plaintiffs note that the administrative law judge in the SOAH proceeding declined to address the constitutional questions. Even so, all the law requires is that the issue have been preserved for the appeal to the state court. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986).

program causes . . . employees to violate citizens' constitutional rights' and the actor nevertheless 'choose[s] to retain that program.'" *Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011) (citation omitted).

The plaintiffs argue that Robinson improperly delegated her subpoena authority to subordinates whose training she knew nothing about.  Therefore, the subpoena did not comply with Texas law because the Executive Director of the Board is not permitted to delegate her subpoena authority.  The district court did not determine whether the delegation was permissible.  "In light of the express regulatory authority for the delegation, the precedent set by her predecessors, and the sheer volume of subpoenas issued every year by the TMB," Robinson's actions did not amount to deliberate indifference.

In Texas administrative law, a rule of statutory construction presumes that where a statute grants specific authority to a designated public officer, the legislature intended only that officer to have that authority.  *Lipsey v. Tex. Dep't of Health*, 727 S.W.2d 61, 64 (Tex. App.—Austin 1987, writ ref'd n.r.e.). Still, *Lipsey* recognized "the authority to 'subdelegate' or transfer the assigned function may be *implied* and the presumption defeated owing to the nature of the assigned function, the makeup of the agency involved, the duties assigned to it, the statutory framework, and perhaps other matters."  *Id.* at 65.

In this case, a statute permits the Board to subpoena records. TEX. OCC. CODE. § 153.007.  Section 153.007(b) permits the Board to delegate subpoena authority "to the executive director or the secretary-treasurer of the board." By administrative rule, the executive director may "delegate any responsibility or authority to an employee of the board."  22 TEX. ADMIN. CODE § 161.7(c).

In resolving this issue, we start with the fact the rule articulated in *Lipsey* is only a presumption.  Even assuming that the plaintiffs could show that Robinson failed to train her subordinates and that failure resulted in a

constitutional violation, Robinson was not deliberately indifferent in delegating her subpoena authority in light of the fact she was acting pursuant to the regulations in the same way as her predecessors and the numerous subpoenas issued each year. To the extent the plaintiffs seek to impose Section 1983 liability on Kirby and Pease through the subdelegation argument, that law also was not clearly established.

AFFIRMED.

No. 17-50518

DON R. WILLETT, Circuit Judge, concurring in part, dissenting in part:

State investigators, without notice and without a warrant, entered a doctor's office and demanded to rifle through the medical records of 16 patients. Or else. The doctor was not in, and the investigators, after being told that the doctor contested the subpoena, warned his assistant that if she didn't produce the patient files at once, there would be grave repercussions. According to her, the investigators threatened to suspend the doctor's medical license. They demanded compliance—immediately.

The Fourth Amendment forbids such roughshod rummaging. The Framers cared deeply about We the People's right "to be secure in [our] persons, houses, papers, and effects against unreasonable searches and seizures."[1] The Fourth Amendment was the Founding generation's "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[2] In fact, outrage over unchecked searches was "one of the driving forces behind the Revolution itself."[3]

The majority opinion correctly diagnoses Dr. Zadeh's injury but refuses to prescribe a remedy: His rights were violated, but since the law wasn't clearly established, Dr. Zadeh loses. I originally agreed with this violation-without-vindication result.[4]

But deeper study has convinced me that the officials' constitutional misstep violated clearly established law, not a previously unknown right. And

---

[1] U.S. CONST. amend. IV.

[2] *Riley v. California*, 134 S. Ct. 2473, 2494 (2014).

[3] *Id.*

[4] *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring dubitante).

25

No. 17-50518

it has reaffirmed my broader conviction that the judge-made immunity regime ought not be immune from thoughtful reappraisal.

I

To rebut the officials' qualified-immunity defense and get to trial, Dr. Zadeh must plead facts showing that the alleged misconduct violated clearly established law.[5] He has done so.

A

The Supreme Court held 40-plus years ago in *See* that the Fourth Amendment requires precompliance review.[6] An administrative subpoena "may not be made and enforced by the inspector in the field . . . ."[7] Almost 20 years later, the Court in *Lone Steer* elaborated that although an agency "may issue an administrative subpoena without a warrant," it must give the subpoenaed person an opportunity "to question the reasonableness of the subpoena . . . by raising objections in an action in district court" before suffering any penalties for noncompliance.[8] The Court reaffirmed this settled precompliance-review requirement again just four years ago in *Patel*.[9]

Here, Texas officials gave Dr. Zadeh no time to question the subpoena's reasonableness. That's a violation. Plain and simple.

B

But there are exceptions to most every rule. Under the Supreme Court's 1981 decision in *Burger*, officials don't have to give people time to comply if:

- the business is part of a closely regulated industry;

---

[5] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[6] *See v. City of Seattle*, 387 U.S. 541 (1967).

[7] *Id.* at 544–45.

[8] *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984).

[9] *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) ("[T]he subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.").

26

No. 17-50518

- there's a substantial government interest;
- warrantless searches are necessary; and
- there's a "constitutionally adequate substitute for a warrant."[10]

This search whiffs two requirements. So I agree with the majority opinion: The *Burger* exception doesn't apply.

1

Medical practices—including pain-management clinics—aren't "closely regulated" industries. In both *Burger*[11] and *Patel*,[12] the Supreme Court considered the history of warrantless searches, then-current regulations, and the public interest. Take *Patel*. The Court held that hotels aren't a closely regulated industry—no history of regular, warrantless searches.[13] Public-accommodation laws require hotels to serve all paying customers. That just doesn't equate to state officials knocking down doors.[14]

Likewise, state officials haven't historically rummaged through pain-management clinics without warrants. If anything, it's the opposite. The law has consistently protected doctor–patient confidentiality. In 2011, the Supreme Court in *Sorrell* noted that "for many reasons, physicians have an interest in keeping their prescription decisions confidential."[15] Ten years earlier, the Court in *Ferguson* recognized medical patients' "reasonable expectation of privacy"—that no one will share their records without permission.[16]

---

[10] *New York v. Burger*, 482 U.S. 691, 702–03 (1987).

[11] *See id.* at 704.

[12] *See Patel*, 135 S. Ct. at 2454.

[13] *Id.* at 2455.

[14] *Id.*

[15] *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011).

[16] *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001).

It's not just our Nation's highest court. Lower courts recognize this too. The district court here emphasized that "warrantless inspections of doctors' offices" don't often happen.[17] In 2017, another Texas federal district court stressed a stark distinction between medicine and "closely regulated" industries. The court noted that the government has long treated liquor and guns very differently than doctors.[18]

True, we held in *Schiffman* that pharmaceuticals are a "pervasively" regulated industry.[19] But that was in 1978. And the Supreme Court has since clarified things. As the Court said in *Patel*, the closely-regulated-industry exception is very much that—"the exception."[20] So *Schiffman* doesn't control.

In sum, the law strongly protects privacy in medicine. Pain management is a medical field. So pain-management clinics aren't closely regulated.

Unfortunately, the majority opinion assumes without deciding that pain-management clinics *are* closely regulated. In doing so, the majority blurs constitutional contours.[21] Our legal system serves the public best when it provides clear rules, consistently applied—bright lines and sharp corners. We owe clarity to the courts below us, the litigants before us, and the cases beyond us. Thankfully, our court has at least established that medicine generally isn't closely regulated.

2

Setting aside the "closely regulated" issue, the *Burger* exception still doesn't apply. The laws here aren't a constitutionally adequate substitute for

---

[17] *Zadeh v. Robinson*, No. 1:15-CV-598, Dkt. No. 40, at \*10 (W.D. Tex., Apr. 26, 2016), *aff'd*, 902 F.3d 483 (5th Cir. 2018).

[18] *Barry v. Freshourt*, No. H-17-1403, 2017 WL 4682176, at \*6–7 (Rosenthal, J.) (S.D. Tex. Oct. 18, 2017), *rev'd on other grounds*, 905 F.3d 912 (5th Cir. 2018).

[19] *United States v. Schiffman*, 572 F.2d 1137, 1142 (5th Cir. 1978).

[20] 135 S. Ct. at 2455.

[21] *See* discussion *infra* Section III.

No. 17-50518

a warrant. In *Burger*, the Court explained that a statute has to notify the public that the government can search on-demand. And it must limit officer discretion.[22] These statutes neither notify nor limit.[23]

Our 2000 decision in *Beck* sheds light on what counts for notice.[24] There, the Controlled Substances Act explicitly authorized officers to search dental offices "upon stating [their] purpose[s]" and showing their credentials.[25] That was clear statutory notice. And so we upheld an on-demand search. In other words, there had to be notice that no notice is necessary.[26]

Consider our 2001 opinion in *Fort* too.[27] There, we stamped our approval on a statute that allowed officers to inspect vehicles "after stating the purpose of the inspection."[28] The law put Texas drivers on notice that their cars could be searched. Eight years later in *Club Retro*, we again enforced the notice requirement.[29] That time, a SWAT team had raided a nightclub—replete with "physical assault, threats at gunpoint, and prolonged detention."[30] But the

---

[22] *Burger*, 482 U.S. at 703 ("[Statutes must] perform the two basic functions of a warrant: it must advise . . . that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of inspecting officers.").

[23] TEX. OCC. CODE § 153.007 ("[T]he board may issue a subpoena or a subpoena duces tecum to compel the attendance of a witness and the production of books, records, and documents."); TEX. OCC. CODE § 168.052 (allowing the Board to examine "the documents of a physician practicing at the clinic, as necessary to ensure compliance with this chapter"); 22 TEX. ADMIN. CODE § 179.4 ("Upon the request by the board or board representatives, a licensee shall furnish to the board copies of medical records . . . within a reasonable time period . . . ."); 22 TEX. ADMIN. CODE § 195.3 ("The board may inspect a pain management clinic certified under this chapter, including the documents of a physician practicing at the clinic, to determine if the clinic is being operated in compliance with applicable laws and rules.").

[24] *Beck v. Tex. St. Bd. of Dental Exam'rs*, 204 F.3d 629, 639 (5th Cir. 2000).

[25] *Id.* at 639.

[26] *Id.* ("Thus, [the statute] did not require that prior notice be given.").

[27] *United States v. Fort*, 248 F.3d 475, 482 (5th Cir. 2001).

[28] *Id.* (citing TEX. TRANSP. CODE § 644.104(b)).

[29] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 200 (5th Cir. 2009).

[30] *Id.*

No. 17-50518

supposed authorizing statute notified owners only of periodic fire-safety and alcohol compliance checks.[31] So we held that the search failed to meet the notice requirement.[32]

Here, the statutes don't notify business owners of on-demand searches. These statutes allow "a reasonable time" to produce records.[33] And they define "reasonable time" as "fourteen calendar days"; less only if there's an emergency or a risk "that the records may be lost, damaged, or destroyed."[34] That's not notice of routine, on-the-spot searches.

Lastly, the statutes don't limit officer discretion. The only limits: who can subpoena things (the Board);[35] who the Board can subpoena (licensees);[36] and what the Board can demand (medical records).[37] But that's it. Otherwise, there's total discretion.

Thus, the *Burger* exception doesn't apply. And so all that's left to decide is if the violation was clearly established.

C

It was. Just last year in *Wesby*, the Supreme Court explained that "clearly established" means "settled law."[38] "[C]ontrolling authority" must

---

[31] *Id.*

[32] *Id.*

[33] TEX. ADMIN. CODE § 179.4(a).

[34] *Id.*

[35] *Id.* ("Upon the request *by the board* or board representatives, a licensee shall furnish to the board copies of medical records . . . within a reasonable time period . . . ." (emphasis added)).

[36] *Id.* ("Upon the request by the board or board representatives, *a licensee shall furnish* to the board copies of medical records . . . within a reasonable time period . . . ." (emphasis added)).

[37] *Id.* ("Upon the request by the board or board representatives, a licensee shall furnish to the board *copies of medical records* . . . within a reasonable time period . . . ." (emphasis added)).

[38] *Wesby*, 138 S. Ct. at 589 (2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)).

No. 17-50518

explicitly adopt the principle; or else there must be "a robust consensus of cases of persuasive authority."[39] Mere implication from precedent doesn't suffice.[40]

What's more, the Court in *Wesby* reiterated that the legal principle must be specific—not general. The rule must "prohibit the officer's conduct in the particular circumstances before him."[41] The Court doesn't require "a case directly on point."[42] But it does require a case "where an officer acting under similar circumstances . . . violated the Fourth Amendment."[43]

The Supreme Court in *See*,[44] *Lone Steer*,[45] and *Patel*[46] made clear the need for precompliance review of administrative subpoenas. That's controlling law.

Summing up: The Board violated Dr. Zadeh's Fourth Amendment rights. No exception applies. And the law was clearly established. The state officials are thus not immune. On this basis alone, Dr. Zadeh deserves his day in court.

II

Respectfully, I think that the majority opinion is wrong for two reasons. First, this court shouldn't determine whether exceptions to violations are clearly established. Second, even if we should, Dr. Zadeh should win anyway.

A

The majority concedes that the statutes here don't limit the discretion of the inspecting officers as *Burger* requires. The court also acknowledges that

---

[39] *Id.* at 590 (cleaned up) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)).
[40] *Id.*
[41] *Id.*
[42] *Id.* (quoting *al-Kidd*, 563 U.S. at 741).
[43] *Id.* (quoting *White v. Pauley*, 137 S. Ct. 548, 552 (2017) (per curiam)). *But cf.* discussion *infra* Section III.
[44] 387 U.S. at 544–45.
[45] 464 U.S. at 415.
[46] 135 S. Ct. at 2452.

statutes must provide notice. Yet the court holds that these requirements weren't—themselves—clearly established.

I understand the impulse. After all, qualified immunity is supposed to protect "all but the plainly incompetent or those who knowingly violate the law"—that's what the Supreme Court remarked in *Wesby*.[47] So if reasonably competent officers wouldn't necessarily know that they're violating the law, they shouldn't be liable. For example, the majority says that since we haven't yet enforced the limited-discretion requirement, reasonable officials could've thought that the subpoena satisfied *Burger*. Thus, they wouldn't necessarily realize they're breaking the law.

But that hyperspecific take snubs the Supreme Court's time-worn test: Was there a clearly established violation?[48] Yes, it's a violation to conduct a warrantless search without precompliance review. Sometimes there's an exception to this test. But not here. No exception applies. And it's only when an exception applies that the general rule doesn't.

B

Yet even if we should ask whether the *Burger* exception was clearly established, Dr. Zadeh still ought to win. Controlling law dictates that there must be statutory notice.

Recall *Beck*. In that case, the law authorized on-demand, warrantless searches. And so we upheld the search.[49] Don't forget *Fort*[50] or *Club Retro*[51] either, in which we similarly enforced the notice requirement. Then of course there's *Burger* itself. In upholding a warrantless search, the Supreme Court

---

[47] 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).
[48] *See* discussion *infra* Section III.
[49] 204 F.3d at 639.
[50] 248 F.3d at 482.
[51] 568 F.3d at 200.

No. 17-50518

emphasized that the statute "set[] forth the scope of the inspection and, accordingly, place[d] the operator on notice as to how to comply with the statute."[52]

Those cases control. They require statutory notice. So the *Burger* exception's notice element is clearly established. And the Texas laws don't provide notice for on-demand inspections.

For that reason, the limited-discretion requirement shouldn't matter. The notice requirement would govern. No matter how you shake it, the officials shouldn't be immune.

## III

Yet here we are—Dr. Zadeh still loses; there and back again. Everyone agrees his Fourth Amendment rights were violated. But owing to a legal *deus ex machina*—the "clearly established" prong of qualified-immunity analysis— the violation eludes vindication. At first I agreed with the panel majority that the government violated the law but not *clearly established* law. I was wrong. Beyond this case, though, I must restate my broader unease with the real-world functioning of modern immunity practice.

To some observers, qualified immunity smacks of unqualified impunity, letting public officials duck consequences for bad behavior—no matter how palpably unreasonable—as long as they were the *first* to behave badly. Merely proving a constitutional deprivation doesn't cut it; plaintiffs must cite functionally identical precedent that places the legal question "beyond debate" to "every" reasonable officer.[53] Put differently, it's immaterial that someone acts unconstitutionally if no prior case held such misconduct unlawful. This

---

[52] 482 U.S. at 711.

[53] *Ashcroft*, 563 U.S. at 741; *see also, e.g., Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

current "yes harm, no foul" imbalance leaves victims violated but not vindicated. Wrongs are not righted, and wrongdoers are not reproached.

Today the majority opinion says Dr. Zadeh loses because his rights weren't clearly established. But courts of appeals are divided—intractably— over precisely what degree of factual similarity must exist. How indistinguishable must existing precedent be? On the one hand, the Supreme Court reassures plaintiffs that its caselaw "does not require a case directly on point for a right to be clearly established."[54] On the other hand, the Court admonishes that "clearly established law must be 'particularized' to the facts of the case."[55] How to square these abstract instructions? Take Dr. Zadeh. Effectively, he loses since no previous panel has ever held this exact sort of search unconstitutional. In day-to-day practice, the "clearly established" standard is neither clear nor established among our Nation's lower courts.

Two other factors perpetuate perplexity over "clearly established law." First, many courts grant immunity without first determining whether the challenged behavior violates the Constitution.[56] They avoid scrutinizing the alleged offense by skipping to the simpler second prong: no factually analogous precedent. Forgoing a knotty constitutional inquiry makes for easier sledding, no doubt. But the inexorable result is "constitutional stagnation"[57]—fewer courts establishing law at all, much less *clearly* doing so. Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are

---

[54] *Kisela*, 138 S. Ct. at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

[55] *Pauly*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640).

[56] *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

[57] Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. CAL. L. REV. 1, 12 (2015) ("Because a great deal of constitutional litigation occurs in cases subject to qualified immunity, many rights potentially might *never* be clearly established should a court skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case. The danger, in short, is one of constitutional stagnation." (cleaned up)).

producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.

Second, constitutional litigation increasingly involves cutting-edge technologies. If courts leapfrog the underlying constitutional merits in cases raising novel issues like digital privacy, then constitutional clarity—matter-of-fact guidance about what the Constitution requires—remains exasperatingly elusive. Result: gauzy constitutional guardrails as technological innovation outpaces legal adaptation.

Qualified immunity aims to balance competing policy goals: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[58] And I concede that the doctrine enjoys special favor at the Supreme Court, which seems untroubled by any one-sidedness.[59] The Court recently declined to take up a closely watched case challenging the warrantless strip search of a four-year-old preschooler.[60] A strange-bedfellows alliance of leading scholars and advocacy groups of every ideological stripe—perhaps the most diverse amici ever assembled—had joined forces to urge the Court to fundamentally reshape immunity doctrine. Even in

---

[58] *Pearson*, 555 U.S. at 231 (flagging these "two important interests").

[59] That said, four sitting Justices "have authored or joined opinions expressing sympathy" with various doctrinal, procedural, and pragmatic critiques of qualified immunity. Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797, 1800 (2018) (including Justices Thomas, Ginsburg, Breyer, and Sotomayor, plus recently retired Justice Kennedy).

[60] *Doe v. Woodard*, 912 F.3d 1278 (10th Cir. 2019), *cert. denied*, No. 18-1173, 2019 WL 1116409, at *1 (May 20, 2019).

this hyperpartisan age, there is a growing, cross-ideological chorus of jurists[61] and scholars[62] urging recalibration of contemporary immunity jurisprudence.

Indeed, it's curious how this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations.[63] Count me with Chief Justice Marshall: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."[64]

---

[61] *See, e.g.*, *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting) (fearing the Supreme Court's "one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment" and signaling "that palpably unreasonable conduct will go unpunished"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Thompson v. Clark*, No. 14-CV-7349, 2018 WL 3128975, at *11 (E.D.N.Y. June 26, 2018) (Weinstein, J.) ("The Supreme Court's recent emphasis on shielding public officials and federal and local law enforcement means many individuals who suffer a constitutional deprivation will have no redress . . . .").

[62] Last year's symposium issue of the Notre Dame Law Review gathers several scholarly essays that scrutinize qualified immunity and discuss potential refinements given mounting legal and empirical criticism. Symposium, *The Future of Qualified Immunity*, 93 NOTRE DAME L. REV. 1793 (2018); *see also, e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 88 (2018) (claiming the doctrine "lacks legal justification, and the Court's justifications are unpersuasive"); Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 YALE L.J. 2, 70 (2017) (concluding that "the Court's efforts to advance its policy goals through qualified immunity doctrine has been an exercise in futility"); John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 FLA. L. REV. 851, 869 (2010) ("Today, the law of qualified immunity is out of balance . . . . The Supreme Court needs to intervene, not only to reconcile the divergent approaches of the Circuits but also, and more fundamentally, to rethink qualified immunity and get constitutional tort law back on track."). The essays in Notre Dame Law Review feature lively disagreement, including a nuanced pro-immunity piece by Professors Aaron Nielson and Christopher Walker, *A Qualified Defense of Qualified Immunity*, that addresses two principal anti-immunity arguments—that qualified immunity (1) is unlawful as a matter of positive law and (2) fails to advance its purported policy objectives. Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018).

[63] *Cf. United States v. Ugalde*, 861 F.2d 802, 810 (5th Cir. 1988) ("We must ensure that for every right there is a remedy." (citing *Marbury*, 5 U.S. at 163)).

[64] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). In *Little v. Barreme*, Chief Justice Marshall's opinion declined to "excuse from damages" Captain George Little for

No. 17-50518

Doctrinal reform is arduous, often-Sisyphean work. Finding faults is easy; finding solutions, less so. But even if qualified immunity continues its forward march and avoids sweeping reconsideration, it certainly merits a refined procedural approach that more smartly—and fairly—serves its intended objectives.

---

unlawfully capturing a Danish vessel, though it was "seized with pure intention." 6 U.S. (2 Cranch) 170, 179 (1804).