# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2025

Lyle W. Cayce
Clerk

No. 24-10663

RONNIE ALEXANDER,

*Plaintiff—Appellant*,

*versus*

PHILIP R. TAFT PSY D AND ASSOCIATES, P.L.L.C.; HENDERSON COUNTY TEXAS; NATHANIEL PATTERSON; TAYLOR CALDWELL; MORGAN FAIN; NOAH KREIE; WILLIAM TRUSSEL; DORA MARTINEZ; MELISSA HARMON; PHILIP TAFT,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-395

ON PETITIONS FOR REHEARING AND REHEARING EN BANC

Before DENNIS, OLDHAM, and DOUGLAS, *Circuit Judges*.

DANA M. DOUGLAS, *Circuit Judge*:

The petition for panel rehearing is DENIED. No member of the panel nor judge in regular active service having requested that the court be polled on rehearing en banc, the petition for rehearing en banc is also DENIED. FED. R. APP. P. 35; 5TH CIR. R. 40. JUDGE DENNIS

No. 24-10663

having filed a revised dissent, the prior opinions, *Alexander v. Taft*, 143 F.4th 569 (5th Cir. 2025), are WITHDRAWN, and the following opinions are SUBSTITUTED.

Ronnie Alexander was arrested and detained in Henderson County Jail while he awaited trial. Hoping to transfer out of the group holding cell, he falsely informed Jail officials that he was suicidal. The Jail subsequently transferred him to its suicide-prevention cell, known as the "violent cell."

The violent cell has no toilet, running water, or bedding, and the lights run at all hours. Alexander was housed there for five days, after which he was released from the Jail. He subsequently filed this lawsuit, bringing federal- and state-law claims challenging the conditions of his confinement in the violent cell and the adequacy of the Jail's mental health services. The district court granted the defendants' motions to dismiss. We AFFIRM.

I

A

On March 8, 2021, Ronnie Alexander was booked at the Jail.[1] The next day, he underwent a medical intake screening, during which he reported that he was not suicidal. He showed no signs of intoxication or withdrawal; nevertheless, he was placed on alcohol withdrawal protocol under which he received "a suite of prescriptions." At all relevant times, Southern Health Partners provided non-mental health care at the Jail, while Philip R. Taft, Psy.D & Associates, P.L.L.C., provided mental health care. One of Taft's employees, Jessica Phlips, was assigned to visit inmates.

Shortly after Alexander's booking, Phlips visited him and observed no mental health issues, but noted that he disclosed suffering from post-

_____

[1] The record does not identify the crime for which he was booked.

2

traumatic stress disorder ("PTSD") and depression.  After a follow-up meeting, she identified no concerns regarding his mental status.  Soon thereafter, the Jail designated Alexander a maximum-security detainee and placed him in group detention "with some of the most violent and dangerous men being held at the Jail."  Alexander alleges that the other inmates consistently threatened him, causing him to fear for his safety and his blood pressure to rise.

Worried by the circumstances, Alexander requested transfer to another cell several times.  The guards refused.  Eventually, he falsely informed a correctional officer that he was suicidal, "believing that would force the [J]ail to move him out of the group detention cell for medical or mental health evaluation."  He was correct.  On March 10, officers transferred him to the violent cell.  Along the way, they harassed Alexander, calling him a "b****" and telling him that he "really f***** up now, b****."

Alexander paints a grim picture of the violent cell.  It has "no bed, sink, toilet, shower, or running water of any kind."  The only place for an inmate to urinate or defecate is through a small, grated drain in the middle of the floor.  He received no toilet paper, so he used a paper cup to force fecal matter through the drain.  And he had no access to running water or utensils, forcing him to eat "with hands that were perpetually contaminated with fecal bacteria." During his five days in the violent cell, "he was never once allowed to leave his cell to use a proper toilet, shower, or wash his hands."[2]

---

[2] While Alexander alleges that "[t]he floor had not been cleaned and was covered in dried urine and fecal matter," he incorporated a color image of his cell, which is an off-white color. From review of this image, the cell appears clean—and certainly devoid of fecal matter—discounting any allegation that the cell was covered in waste. We need not accept allegations clearly disproven by photographic evidence incorporated in the complaint. *See Kokesh v. Curlee*, 14 F.4th 382, 385 n.2 (5th Cir. 2021).

He also had no clothing or sheets, and was provided only a "suicide blanket" to cover himself. In lieu of a bed, the violent cell has a concrete slab built into the wall. The lights ran at all hours, "inhibit[ing]" his ability to sleep. He was provided three eight-ounce cups of water per day—one with each meal. And during his time in the violent cell, he received no exercise or recreation time.

To mitigate these deficiencies, Alexander requested water, toilet paper, and an opportunity to shower or wash his hands. The officers almost uniformly rejected the requests, taking "no affirmative steps whatsoever, beyond cursory visual checks, to ensure that [his] physical and mental health were not suffering from the conditions he was subjected to in the violent cell."[3] Instead, the guards often taunted Alexander. One "loudly discussed taking [him] out to a field and unleashing [a police] dog on him." Another threatened to kill him with a "barbed wire guillotine." Yet another stated: "Ronnie Alexander, you are not leaving this facility alive."

On March 12, two days after Alexander's transfer to the violent cell, Phlips visited. Prior to their meeting, she did not review his medical file or other records and did not have access to the officers' suicide screener. She quickly determined that Alexander was "'too confused' to answer her initial questions" and departed, doing "nothing to alleviate the conditions that were causing [his] psychological deterioration" and "fail[ing] to report her observations to any medical or mental health professionals." She did not visit again.

Alexander remained in the violent cell until March 15, at which time he was released to the custody of Dallas County.

_____

[3] Over the course of his five days in the violent cell, Alexander received "only about three small beverages in total" beyond those he received with his meals.

4

No. 24-10663

B

On February 17, 2022, almost one year after his release, Alexander filed this lawsuit against various individuals and entities, alleging violations of 42 U.S.C. § 1983, alongside various state-law claims.  He amended his complaint several times, ultimately filing his Third Amended Complaint, in which he alleged claims against Southern Health Partners, Inc.; Philip Taft in his individual capacity and Philip R. Taft, Psy.D & Associates P.L.L.C. ("the Taft defendants"); Henderson County, Texas; and Henderson County Correctional Officers Nathaniel Patterson, Taylor Caldwell, Morgan Fain, Noah Kreie, William Trussell, Dora Martinez, and Melissa Harmon ("the officers").

The defendants individually filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The district court granted the defendants' motions over Alexander's opposition, finding that he failed to state a claim under § 1983 against the Taft defendants, Henderson County, and the officers.  It declined to exercise supplemental jurisdiction over Alexander's remaining state-law claims against the Taft defendants and Southern Health Partners and dismissed them without prejudice.  Alexander timely appealed the dismissal of his federal claims.

II

"We review a district court's dismissal of claims under Federal Rule of Civil Procedure 12(b)(6) de novo."  *Clyce v. Butler*, 876 F.3d 145, 148 (5th Cir. 2017).  We "interpret[] the complaint in the light most favorable to the plaintiff," *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 204 (5th Cir. 2013) (quoting *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010)), accepting all well-pleaded facts as true, *see Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019).  However, those facts must state "a claim to relief that is plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While complaints do "not need detailed factual allegations," speculative or conclusory statements of fact are insufficient. *Cicalese*, 924 F.3d at 765 (quoting *Twombly*, 550 U.S. at 555); *Iqbal*, 556 U.S. at 678. And we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III

The Fourteenth Amendment's Due Process Clause provides pretrial detainees protections extending beyond those granted to sentenced defendants. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). While "[a] sentenced inmate . . . may be punished" within the strictures of the Eighth Amendment, "[d]ue process requires that a pretrial detainee not be punished." *Id.*; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015) ("[M]ost importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" (citations omitted)); *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (protecting pretrial detainees "from the use of excessive force that amounts to punishment"). Such protection is fundamental to our criminal justice system. "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime." *Bell*, 441 U.S. at 536. Since the detainee has "had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest,'" the Government may only use such conditions necessary "to ensure his presence at trial." *Id.* (alterations in original) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

No. 24-10663

Due process compels us to ask whether the "restrictions and conditions of the detention facility . . . amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense . . . ." *Id.* at 537. Therefore, traditional "confinement in a facility which . . . results in restricting the movement of a detainee" is permissible. *Id.* Often, these restrictions arise from the Government's "legitimate interests that stem from its need to manage the facility in which the individual is detained." *Id.* at 540. This means that some "administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial" may be warranted. *Id.* Such is the case "even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Id.*

Pretrial detainees may bring claims of such violations "either by demonstrating an unconstitutional condition of confinement or by demonstrating an unconstitutional episodic act or omission." *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020). "For a conditions of confinement claim, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'" *Id.* (quoting *Bell*, 441 U.S. at 535). These conditions "may take the form of 'a rule,' a 'restriction,' 'an identifiable intended condition or practice,' or 'acts or omissions' by a jail official that are 'sufficiently extended or pervasive.'" *Id.* (quoting *Est. of Henson v. Wichita County*, 795 F.3d 456, 468 (5th Cir. 2015)).[4]

_____

[4] Alexander alleges that the violent cell's "conditions had no justifiable purpose and were therefore unlawful punishment," and that he "was harmed by intentional acts or omissions, such as the denial of water and toilet paper." The district court acknowledged this duality, but found that Alexander's "harms . . . stem from the barren conditions within the violent cell" and were "best classified as harms relating from his conditions of confinement." It therefore "proceed[ed] analyzing his Section 1983 claims under the Fifth

No. 24-10663

To determine whether conditions are constitutionally permissible, we ask whether the restrictions and practices "are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Bell*, 441 U.S. at 561. If there is a related governmental objective, the conditions, "without more, [do not] amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate purpose—if it is arbitrary or purposeless— a court may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539 (footnote omitted). Therefore, Alexander must demonstrate, *inter alia*, that the restrictions are not reasonably related to a legitimate governmental objective. *See Cadena*, 946 F.3d at 727 (quoting *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011)). Because Alexander cannot make this showing, as described below, we affirm.

IV

On appeal, Alexander raises the following issues: whether (1) his confinement was an unlawful punishment of a pretrial detainee; (2) the Taft defendants and the County completely deprived him of qualified mental health care, creating an unlawful condition of confinement; (3) Taft is liable in his individual capacity for Alexander's injuries; and (4) he plausibly alleged that the County maintained a custom or practice of punishing inmates through the violent cell. Because we conclude that the violent cell's conditions are reasonably related to a legitimate government interest and are thus not punitive, we do not reach the fourth issue.

_____

Circuit's conditions-of-confinement framework" in light of the clarity provided by the most recent amended complaint. On appeal, Alexander discusses, but does not challenge, this classification. We agree that his claims challenge the conditions of his confinement, and consider them as such.

No. 24-10663

A

We begin with Alexander's claims that Henderson County and the officers unconstitutionally punished him through the conditions of his confinement. Alexander complains that he was subjected to a "barbaric combination of conditions," which he asserts were unjustifiable and therefore punitive. We accept his well-pleaded allegations that he was deprived of a toilet, toilet paper, running water, recreation, bedding, clothing, additional drinking water, or particularly sanitary or clean conditions, and that he was subjected to a 24/7-lights-on policy. We also accept as fact that officers threatened him as alleged.

"Absent a showing of an expressed intent to punish on the part of detention facility officials," we ask whether the "particular condition or restriction . . . is reasonably related to a legitimate nonpunitive governmental objective." *Bell*, 441 U.S. at 538–39. We first consider whether there was an expressed intent to punish, and then ask whether the conditions were reasonably related to a legitimate nonpunitive governmental objective.

1

Alexander argues that the district court failed to credit his well-pleaded allegations that prison officials were aware that he was not actually suicidal. As Alexander frames it, he informed the guards that he was suicidal to escape group housing. But when they moved him to solitary confinement, they did so not to protect him, but to punish him.[5]

_____

[5] The district court did not consider these allegations. The dissent says that this "should end the analysis." *Post*, at 27. But a district court need only consider well-pleaded allegations of fact, not speculation about others' states of mind. *Cicalese*, 924 F.3d at 765 (noting that we need not accept speculative allegations); *Iqbal*, 556 U.S. at 678 (requiring factual content that leads to "reasonable inferences"). Nor does the failure to consider a handful of allegations always warrant reversal. Such is especially so here, considering that

No. 24-10663

As an initial matter, Alexander was not transferred until he informed correctional officers that he was suicidal. That alone implies that the officers took his statement at face value, even if they did not subjectively believe him. But Alexander points to the vulgar comments the officers made during his transfer, including that he "really f***** up now, b****." This, he claims, gives rise to the inference that "the guards did not care about [his] fear of his cellmates or spiking blood pressure and wanted to punish him for complaining." He asserts that "[i]t can be further inferred that they also knew [he] could expect to suffer while he was in the violent cell." Inappropriate as the officials' statements may be, they do not evince punitive intent, even if they followed several denied requests for relocation. The same is true of any threats directed at Alexander while he was in the violent cell.[6] Alexander alleges no facts of the officers' explicit intent to punish him, or that they outwardly disbelieved him, or that other suicidal inmates received different treatment.[7]

————————————————

Alexander's framing requires an inferential leap—from the officers' alleged subjective disbelief to an expressed intent to punish—that we need not accept. Nevertheless, as described below, the allegation does not save his complaint. *See also Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) (explaining that we may affirm on any ground supported by the record).

[6] The threats included unleashing a police dog on Alexander and threatening to kill him with a barbed wire guillotine. Officers also stated that Alexander would not "leav[e] this facility alive." We do not endorse such comments. But "[m]ere allegations of verbal abuse do not present actionable claims under § 1983. 'As a rule, "mere threatening language and gestures of a custodial officer do not, even if true, amount to a constitutional violation."'" *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993) (alteration omitted) (quoting *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983)). Therefore, to the extent that Alexander suggests that these comments created a condition of confinement that violated the Constitution, we disagree.

[7] The dissent argues that we "invert[] Rule 12(b)(6)" by "assum[ing] facts in favor of the moving party." *Post*, at 26 n.1. Not so. The facts alleged, taken as true, do not give rise to the reasonable inference that the officers intended to punish Alexander. Beyond these insufficient factual allegations, he may claim that the officers desired to punish him,

No. 24-10663

Moreover, it matters not whether the officers believed he was suicidal. County jails have a constitutional duty to ensure the safety of potentially suicidal detainees. *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992) ("The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights."). Allowing this allegation to bootstrap Alexander's complaint past a motion to dismiss would create a minefield we decline to enter. Consider the dangers of requiring officers to second-guess every inmate's report of suicidal ideation. If they believe and transfer a dishonest detainee, as here, they would be liable for conditions that are designed to protect suicidal inmates. But if they disbelieve and do not transfer an honest detainee, they would also be liable, and the detainee would be in serious danger of self-harm. This standard is unworkable and would result in the denial of constitutional protections, and we therefore reject it.

2

We next consider whether the conditions of the violent cell are reasonably related to a legitimate governmental interest. As discussed above, pretrial detainees have a constitutional right to protection from self-harm. *Rhyne*, 973 F.2d at 391. As barren as the violent cell was, each condition was reasonably related to the legitimate government interest of protecting suicidal inmates from self-harm.

---

but any allegation to that effect is speculation that we need not accept. *See Cicalese*, 924 F.3d at 765. And, as described later, we do not depend on whether officers believe an individual's report of suicidal ideation.

Nor do we "fault[] Alexander for not meeting a legal test that finds no support in precedent" through our discussion of similarly situated detainees. *Post*, at 28. Where there are insufficient factual allegations demonstrating punitive intent, a detainee could presumably make a showing of punitive intent through disparate treatment of similarly situated individuals. Alexander failed to do so.

Alexander alleges that the cell did not have a toilet, a shower, or running water. But each of these poses a drowning risk. *See, e.g.*, *Elliott v. Cheshire County*, 940 F.2d 7, 9 (1st Cir. 1991) (noting that the prisoner stated that "he wanted to drown himself in the toilet"); *Belcher v. City of Foley*, 30 F.3d 1390, 1393 (11th Cir. 1994) ("As the officers attempted to move Mr. Belcher, he broke away and stuck his head into the toilet in an attempt to drown himself."); *Cervantez v. Frith*, No. 22-150, 2025 WL 1287918, at *1 (N.D. Tex. May 2, 2025) (inmate attempted to drown himself in the toilet three separate times); *Crocco v. Winkler*, 659 F. Supp. 3d 204, 207 (D.N.H. 2023) ("Crocco attempted to drown himself in the cell's sink . . . ."). He claims that he was stripped and provided no bedding. But clothes and sheets carry risks of self-asphyxiation, especially when combined with showers, sinks, or toilets. *See, e.g.*, *McMahon v. Beard*, 583 F.2d 172, 175 (5th Cir. 1978) ("Removal of all cloth which might offer a means for suicide would seem prudent."); *Hare v. City of Corinth*, 36 F.3d 412, 414 (5th Cir. 1994) (inmate hanged herself "from the bars of her cell" using "strips of the blanket"); *Lewis v. Stephens*, 710 F. App'x 703, 703 (7th Cir. 2018) ("He stood on the sink in his cell with a bedsheet tied around his neck, threatening to hang himself."); *Romero v. Donley County*, 87 F.3d 1311, at *1 (5th Cir. 1996) (unpublished) (inmate hanged himself from bar above the toilet); *Rangel v. Wellpath, LLC*, No. 23-128, 2024 WL 1160913, at *1 n.3 (N.D. Tex. Mar. 18, 2024) (inmate "tore the blanket into strips, tied them to the shower head, and hung himself"). He states that his requests for toilet paper were denied. But, sadly, even toilet paper could pose a choking hazard. *See Nagle v. Gusman*, 61 F. Supp. 3d 609, 624 (E.D. La. 2014) (deposition testimony that an inmate "swallowed a roll of toilet paper and killed himself"); *Elliott*, 940 F.2d at 9 (inmate that had previously threatened suicide asked another "what

would happen if he . . . swallowed paper towels").[8]  Moreover, a twenty-four-hour-lights-on policy permits officers to monitor the inmate's activity around the clock to prevent them from self-harming.  *Cf. Anderson v. Dallas County*, 286 F. App'x 850, 852 n.1 (5th Cir. 2008) (noting that "[o]nce an inmate is placed on Suicide Prevention Status, jailers must routinely monitor and observe the inmate").  These conditions, "barbaric" as they may be,

---

[8] We note that Alexander complains of other rejected requests and conditions, including requests for additional drinking water and to shower or wash his hands, and a lack of recreational time.  All inmates have "a right to adequate food." *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982).  Inherent in such a right is access to water.  But we hesitate to take Alexander's suggestion that he ought to have received the "ideal" amount of drinking water for an adult male, which he totals to be 124 ounces.  Even if Alexander's drinking water values were lower than what a typical person may aim for, we cannot say that he was provided "inadequate" water to the point of constitutional deprivation.  This determination, of course, is context-dependent.  But we decline to create an express baseline for daily water consumption for prisoners in suicide prevention cells.

As for the inability to shower and the loss of recreation time, such are reasonably related to the legitimate interest in protecting him from self-harm.  Officials would have been required to move him out of the protective cell, provide him access to running water and a shower head—among the dangers from which he was isolated—and afford recreational time in open space, possibly with other inmates.  These acts could pose a danger to an individual suffering suicidal ideation, and are not "arbitrary or purposeless." *Bell*, 441 U.S. at 539.  We expressly limit this holding to Alexander's circumstances.  We do not extend this to instances in which an individual is in such a cell for other periods of time or subjected to other conditions.

Finally, while we need not credit Alexander's allegation that waste covered the floor, *see supra* n.2, this alleged condition is a far cry from the horrifying facts presented in *Taylor v. Riojas*, which amounted to an Eighth Amendment violation.  *See* 592 U.S. 7, 8–9 (2020) (inmate was confined in two cells, one of which "was covered, nearly floor to ceiling, in massive amounts of feces" and the second of which was "frigidly cold" and "equipped with only a clogged drain in the floor to dispose of bodily wastes").  The photograph in Alexander's complaint discounts any allegation that the violent cell was in nearly the state of the cell in *Taylor*, or amounted to a punitive condition under the circumstances.

relate to the legitimate government interest of protecting inmates—an interest that is constitutionally imposed upon the State.[9]

To be sure, these conditions are not narrowly tailored. They are overinclusive, painting with a broad brush to protect those who pose the greatest danger to themselves. But *Bell* looks only for a reasonable relationship, not narrow tailoring. So, even if these conditions are overly protective of Alexander, they are sufficiently related to the Jail's legitimate interest in protecting suicidal inmates and thus pass constitutional muster.[10]

---

[9] The district court found that the violent cell was "reasonably tailored to the state's interest in preventing suicides." But it then relied on out-of-circuit caselaw to alternatively hold that "the violent cell's conditions did not deprive Alexander of life's minimal necessities." We disagree.

We have previously held that similar conditions violate the Eighth Amendment where there is punitive intent. *See, e.g.*, *McCray v. Sullivan*, 509 F.2d 1332, 1336 (5th Cir. 1975) (finding an Eighth Amendment violation where "[a]s many as seven" prisoners were placed in a single cell in punitive isolation measuring six feet by eight feet, which lacked "bunks, toilets, sinks[,] or other facilities," and had only a "hole in the cell floor" as a toilet that was flushed four times each day and often backed up); *Alexander v. Tippah County*, 351 F.3d 626, 628–31 (5th Cir. 2003) (referring to conditions as "deplorable" where inmates punished for fighting were transferred to a similar cell, sewage littered the cell, it was freezing, and inmates were unable to wash their hands before eating). Alexander's housing was affirmatively *not* punitive—it was protective.

Nor do we adopt the district court's suggestion that, because Alexander lived through his confinement at Henderson County Jail, the conditions are per se reasonably related to the Jail's interest in protecting suicidal inmates. The fact that *some* conditions protect a detainee does not make *all* conditions reasonably related to the Government's interest in the detainee's protection. Nevertheless, here, all conditions bore a reasonable relationship to a legitimate government interest, and Alexander's claims therefore fail. It is solely on that basis that we affirm the district court's judgment.

[10] In his complaint and the factual background of the opening brief, Alexander notes that "inmates identified with a potential for self-harm would sometimes be moved into the much less restrictive 'separation cells' if the [J]ail decided it needed the violent cell for someone who was genuinely violent." Those cells have a toilet, sink, shower, table, and bed. This, he claims, shows that the Jail did not believe the violent cell's restrictions were necessary.

No. 24-10663

Because the conditions were sufficiently related to a legitimate governmental interest, Alexander was not punished in violation of the Due Process Clause.[11]  We therefore do not consider whether the officers are entitled to qualified immunity.

B

Alexander's remaining claims focus on medical care.  He argues that "the county was well aware that no qualified mental health care was being provided at the [J]ail" and that its policies and contract with the Taft defendants resulted in a "total, intentional deprivation of qualified mental health care."  Specifically, he alleges that Phlips "did not bother to gather or confirm any information on [him], such as why he was in the violent cell, how long he had been in there, whether he was taking any medication, or anything else."  Instead, she "quickly aborted her visit when she decided that Alexander was 'too confused' to answer her initial questions."  He also alleges that she took no action to help him; lacks medical or mental health licensing; has admitted she is not a clinician; is unqualified to make a clinical

_____

Any argument centering on these alternative cells is forfeited for failure to brief the issue before this court.  *See United States v. Delgado*, 672 F.3d 320, 334 (5th Cir. 2012) (en banc).  Regardless, as we note above, there is no requirement that the violent cell be tailored to the individual.  Where multiple individuals' circumstances warrant placement in the violent cell, spillover into the "separation cells" is required.  But where the violent cell is available, Alexander cannot claim that he should have been placed in a separation cell instead.  The violent cell is the safest place for the Jail to place a suicidal inmate, and the conditions are reasonably related to its interest in protection against suicide.  We decline to suggest that officers should weigh the sincerity of such reports to determine whether a detainee should be housed in a more relaxed cell, given their potential for self-harm.

[11] We do not hold today that the violent cell's conditions are permissible in all circumstances.  For instance, we express no view of the various other individuals' stories that Alexander raises in both his complaint and opening brief.  We hold only that, as it relates to Alexander, accepting his well-pleaded allegations as true, the Jail did not violate his constitutional rights.

No. 24-10663

assessment; and must report her findings to someone qualified to make such an assessment. But, while Alexander believes that "[a] qualified mental health professional would have been alarmed at [his] state and taken steps to address it," Phlips "did not notify Taft or any other medical or mental health professional about Alexander's obvious distress."

Alexander then turns to Taft. He alleges that Taft assigned "an unlicensed person not legally authorized to provide psychological services" to handle his contractual responsibilities without providing written policies or procedures. Because the Jail was aware "from simple observation that [Phlips] was unsupervised and the only person allegedly providing mental health care at the [J]ail," and it knew that she had no license, Alexander asserts that "it was the [J]ail's express policy to deny its entire inmate population access to mental health care of any kind."

We consider first his claims against the County, and then turn to the Taft defendants.[12]

1

_____

[12] The dissent states that the district court dismissed this claim *sub silentio* and we should therefore vacate and remand. *Post*, at 30. But the district court explained that, although Alexander challenged his medical treatment, administrative segregation and his confinement to a suicide-prevention cell did not amount to a constitutional violation. True enough, this analysis did not fully consider one of Alexander's chief complaints—that he did not receive sufficient mental health care—but we may consider this issue nonetheless. "Under our precedent, we may 'affirm on any ground supported by the record, including one not reached by the district court.' This is so even if neither the appellant nor the district court addressed the ground, so long as the argument was raised below." *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) (footnotes omitted) (quoting *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012)). The dissent provides that this principle "applies only when the district court has actually considered the claim." *Post*, at 30. In our view, the district court *did* consider Alexander's § 1983 claim against the Taft defendants, even if it failed to individually consider every factual basis supporting that claim.

16

No. 24-10663

The State must "assume some responsibility for [a pretrial detainee's] safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). These responsibilities include "food, clothing, shelter, medical care, and reasonable safety." *Id.* Medical care includes "protection from violence or suicide." *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). The district court did not expressly consider Alexander's argument that the Jail failed to provide sufficient mental health care, instead dismissing the § 1983 claims against the Taft defendants because the violent cell's conditions did not violate his constitutional rights. Nevertheless, seeing no cognizable claim under § 1983, we affirm. *See Gilbert*, 751 F.3d at 311.

First, Alexander argues that the Jail allowed Phlips, whom he alleges is unlicensed, to provide all mental health care at the Jail. The Texas Commission on Jail Standards requires that each facility have a plan that "provide[s] procedures that shall give inmates the ability to access a mental health professional at the jail or through a telemental health service." 37 Tex. Admin. Code § 273.2(13). "If a mental health professional is not present at the county jail at the time or available by telemental health services, then [the plan must] require the jail to provide the inmate access to, at a minimum, a qualified mental health professional (as defined by [26 Tex. Admin. Code § 301.303(48)]) within a reasonable time." *Id.* Under 26 Tex. Admin. Code § 301.303(48), a qualified mental health professional is one with competency in the work to be performed and (1) has a bachelor's degree from an accredited university with a minimum number of hours dedicated to a major in one of various fields; (2) is a registered nurse; *or* (3) completes an alternative credentialing process.

The complaint repeatedly calls Phlips unqualified, at some point asserting that she is "not legally authorized to make suicide or mental health care assessments." But this legal conclusion, without more, cannot survive

a motion to dismiss. *See Iqbal*, 556 U.S. at 678. Alexander does not allege that Phlips falls short of the three categories in § 301.303(48).[13] He therefore cannot rely on her purported lack of qualifications.

But we cannot assume that there is no constitutional violation just because there is no properly alleged statutory violation under 37 Tex. Admin. Code § 273.2(13). In other words, by maintaining a formal policy, the County may well satisfy its statutory requirements, but it still must provide the constitutional minimum of care. *Cf. Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994) ("A state's failure to follow its own procedural regulations does not constitute a violation of due process, however, if 'constitutional minima [have] nevertheless . . . been met.'" (alterations in original) (quoting *Jackson v. Cain*, 864 F.2d 1235, 1251 (5th Cir. 1989))).

The County provided the constitutional minimum for mental health assistance: "protection from violence or suicide." *Hare*, 74 F.3d at 643. In addition to being housed in a solitary confinement unit in which it was virtually impossible to self-harm, Alexander spoke with the employed mental health individual during his five-day confinement. It matters not that Phlips was not licensed to the extent that Alexander desired. Nor is it of any moment that he disagreed with both her determination that he was too confused to continue to interview and her decision not to recommend his release. While Alexander argues that the Jail's policy "was simply to defer

---

[13] In other words, his complaint is devoid of factual allegations that Phlips (1) lacks a bachelor's degree from an accredited university with a minimum number of hours dedicated to one of the required majors; (2) is not a registered nurse; and (3) has not completed an alternative credentialing process. His allegation that she received "no formal training period" from Taft is not enough to demonstrate that she is unqualified under 26 Tex. Admin. Code § 301.303(48).

completely to the discretion of correctional officers," he does not allege that he ever informed Jail officials—or Phlips—that he was no longer suicidal.

Alexander alternatively blames the violent cell for his severe "psychological deterioration," and claims that Phlips did nothing to remove him therefrom. We cannot charge mental health professionals, contracted to provide care to pretrial detainees, with releasing inmates from suicide cells or improving the conditions of their protective confinement. They have no authority to confine individuals or to free them from confinement. *Cf. McClure v. Foster*, 465 F. App'x 373, 375 (5th Cir. 2012) (noting that the complainant failed to show that it was the nurse's duty to provide toilet paper). Alexander provides only conclusory allegations demonstrating that Phlips or the Jail knew—or had reason to believe—that his mental deterioration was caused by the violent cell's conditions, rather than his self-reported suicidal ideation. This is insufficient to survive a motion to dismiss.

Alexander cannot demonstrate that the County "knowingly subject[ed] [him] to inhumane conditions of confinement or abusive jail practices" through its mental health treatment plan. *Shepherd v. Dallas County*, 591 F.3d 445, 456 (5th Cir. 2009). Because the plan does not violate the Constitution, we do not consider his municipal liability claim against the County. *See Valle v. City of Houston*, 613 F.3d 536, 541-42 (requiring a constitutional violation to impose municipal liability).

2

This leaves the Taft defendants. The Taft defendants are state actors under § 1983. *See West v. Atkins*, 487 U.S. 42, 54 (1988) (noting that "a physician employed by [the State] to provide medical services to state prison inmates[] act[s] under color of state law for the purposes of § 1983" when providing medical care); *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (noting that private companies and employees that

No. 24-10663

manage state prisons "are subject to § 1983 liability because they are performing a government function traditionally reserved to the state"). When determining whether such individuals have violated the Constitution, the plaintiff must demonstrate that (1) "the deprivation alleged was sufficiently serious" and (2) "the prison official possessed a sufficiently culpable state of mind." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001).[14] That state of mind is deliberate indifference. *Id.*

We begin and end with deliberate indifference. "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). In the context of medical care, "[m]ere negligence, neglect, or medical malpractice" does not suffice. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (alteration in original) (quoting *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979)). Where "medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied." *Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019). Because the Taft defendants provided treatment—even if imperfect—Alexander's claim fails.

Alexander points us to another case arising out of the Henderson County Jail and involving the Taft defendants. *See Albritton v. Henderson County*, No. 23-1723, 2024 WL 1776380 (N.D. Tex. Apr. 23, 2024). There, the court stated that "[t]he system for inmates to access mental health care at the Henderson County Jail amounted to a condition that left the inmates with no avenues to access mental health care and this dereliction of care

_____

[14] To qualify under the first of these two prongs, the "official's act or omission must have resulted in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Although we hold that the Jail did not knowingly provide constitutionally insufficient mental health care, we must also ascertain whether the Taft defendants deprived Alexander of mental health services.

cannot be reasonably related to any legitimate governmental objective." *Id.* at *5. With respect to the Taft defendants, it considered allegations similar to those Alexander makes here: Taft contracted with the County, delegated all duties to an unlicensed professional, did not train or supervise that individual, provided no mental health care at the Jail, and did not establish a system through which the individual could contact Taft for assistance. *Id.* at *6. The court concluded that Taft knew that no one could provide mental health assistance and "[t]he substantial risk of harm of Taft flouting his responsibilities to the individuals in need of mental health services while at the [J]ail and outsourcing mental health care to an unqualified individual is so obvious" that it did not matter if Taft *actually* knew of the inmate or was aware of the substantial risk of harm. *Id.*

Albritton "ha[d] the 'mental age' of a six-year-old" and numerous known disabilities. *Id.* at *1. He took "approximately eighteen daily medications to treat his psychological and physical ailments," and was prone to danger when he did not understand his surroundings. *Id.* While housed in the violent cell—despite lacking indications of suicidal thoughts—he did not eat because he believed the food was poisoned, was not provided water, and "had diarrhea . . . on the sleeping bench which no one cleaned up" during the two-day detention. *Id.* at *2. It is unclear whether Taft's aide at the time, Jeffries, ever visited Albritton. The court found that the failure to provide any sort of mental health care to an individual "*like [Albritton] experiencing a mental health crisis*" could contribute to a finding of deliberate indifference. *Id.* at *6 (emphasis added).

The facts here are highly distinguishable. Alexander reported that he was suicidal and was moved to the violent cell. At that point, he claims he mentally deteriorated and that Phlips failed to release him. Putting aside the fact that authority to release him from the violent cell was left to the Jail— not Taft and his employees—it is unclear what Phlips (or Taft) was to make

No. 24-10663

of his mental deterioration. Alexander seemed healthy during Phlips's earlier visits, but was moved to the violent cell after stating that he was suicidal. She then found him unable to answer her questions. She could have drawn the inference that he was *not* ready to be released from a suicide protection cell because he had deteriorated between visits. Such a conclusion would be logical, given that he had previously reported to her that he struggled with depression and subsequently reported suicidal ideation.[15]

Holding the Taft defendants liable would transform our consideration of deliberate indifference into a post-hoc scrutiny of each determination of inmates' mental health statuses. Alexander cannot expose them to liability for failing to release him from the violent cell under these circumstances. His § 1983 claim against the Taft defendants therefore fails.[16]

─────────────────────

[15] We therefore reject Alexander's argument that she should have reported these findings to Taft. The Jail provided Alexander with necessary protections. In Phlips's view, his mental health was being treated.

[16] Alexander also brings a supervisory liability claim against Taft. This requires that he identify a constitutional violation that caused his injury. *See Valle*, 613 F.3d at 541-42. The same is true if he chooses to bring such a claim under a failure-to-train or failure-to-supervise theory. *See Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) ("[W]hen a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate indifference.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))). Since he fails to demonstrate deliberate indifference, Alexander has pleaded no constitutional violation and therefore cannot demonstrate supervisory liability against Taft in his individual capacity under any theory.

The Rule 28(j) material that Alexander filed—the recent opinion in *Anderson v. Henderson County*, No. 24-cv-2394 (N.D. Tex. June 23, 2025)—contemplates different circumstances. There, the detainee "suffer[ed] from muscular dystrophy," resulting "in a significant speech impediment and an inability to move or walk as easily as a healthy person." *Anderson*, slip op. at 1. He, too, suffered from PTSD, but was prescribed medication for its treatment. *Id.* at 2. Upon arrival at the Jail, he was "immediately placed in the . . . 'violent cell' for seven days." *Id.* During that time, despite informing Jail staff

No. 24-10663

V

Alexander asks that we require officers and mental health providers to second-guess inmates' disclosure of suicidal ideation. We decline to create such a requirement. We therefore AFFIRM the district court's order of dismissal.

---

of his medical conditions, "he was *never* seen by any medical or mental health staff." *Id.* (emphasis added). Moreover, he never received his prescription medication. *Id.* at 2–3.

As described above, Phlips visited Alexander. While Alexander may plead similar facts to Anderson—including that Taft provided inadequate training or that his employee was unauthorized to provide psychological services, *see id.* at 9—he *was* visited by a mental health professional affiliated with Taft's practice. Moreover, his circumstances were vastly different: He experienced suicidal ideation. The Taft defendants knew that when Phlips visited him, and took that into account when responding. Anderson, on the other hand, failed to receive *any* of his prescription medication, or any treatment at all. The facts in these cases are inapposite, and *Anderson* therefore does not counsel against dismissal.

To be clear, we do not hold that every actionless visit by a mental health professional passes constitutional muster. We hold that, under Alexander's specific circumstances, as alleged, Phlips and the Taft defendants provided the constitutional minimum of care required.

No. 24-10663

James L. Dennis, *Circuit Judge*, dissenting:

After we issued our opinions in this case, seven leading prison-law scholars filed an amicus brief warning that the majority opinion "makes basic errors of prison law," "misdescribes the Fourteenth Amendment's due process inquiry," "misstates the constitutional inquiry for deliberate indifference to a serious medical need," "addresses hypothetical concerns that simply do not exist," and "ignores the impossible burdens the opinion imposes on incarcerated litigants."[1] These are serious charges.

*        *        *

How did we get here? Jail officials punished pretrial detainee Ronnie Alexander by denying him a toilet, toilet paper, running water, recreation, bedding, clothing, and sufficient drinking water, all while subjecting him to twenty-four-hour lighting and a cell contaminated with human waste. Alexander not only lived in that filth for five days, but he also developed infections in his feet from exposure to urine and fecal matter—allegations the majority ignores entirely.

That type of error pervades the majority opinion. Correctly applying Federal Rule of Civil Procedure 12(b)(6), Alexander has plausibly shown that jail officials misused suicide-watch protocols to punish a pretrial detainee.

With respect for my esteemed colleagues, I dissent.

I

"Due process requires that a pretrial detainee not be punished." *Hare v. City of Corinth*, 74 F.3d 633, 651 (5th Cir. 1996) (Dennis, J., specially concurring). "In determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional

_____

[1] The amicus brief is appended to this dissent.

sense of that word, a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (first citing *Bell*, 441 U.S. at 538; and then quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

Put simply, conditions must advance a legitimate governmental goal *and* cannot be excessively harsh in doing so. The district court, however, dismissed Alexander's conditions-of-confinement claim solely on the ground that the conditions in the "violent cell" were justified by the need to prevent Alexander's suicide and, thus, were reasonably related to a legitimate governmental objective. The majority opinion initially describes *Bell*'s test correctly but repeats the same error: it omits the proportionality requirement in its analysis, addressing only whether the jail's actions purportedly advanced a legitimate objective. Yet, as the amicus brief explains, a great weight of authority holds that exposing a detainee to the conditions Alexander alleges is excessive in relation to any legitimate penological purpose. App. at 3–4. The majority offers no answer, instead opting to tacitly and fundamentally alter the *Bell* test.

At any rate, the majority opinion's governmental goal rationale itself badly misapplies Rule 12(b)(6). Alexander alleges that he falsely claimed to be suicidal as a last resort to escape placement in a dangerous group cell, where other inmates repeatedly threatened him. He further alleges that jail officials knew he was not suicidal but used his plea as a pretext to place him

in the violent cell for punitive purposes. Several key facts, all occurring in rapid succession, support an inference of retaliatory motive.

> **March 8**: Alexander was booked into the jail. A Henderson County mental health professional conducted an "observation clearance," observing no concerns with his mental health.

> **March 9 (daytime)**: The same provider performed a follow-up and again documented "no concerns" with Alexander's mental status.

> **March 9 (evening)**: Guards placed Alexander in group detention "with some of the most violent and dangerous men being held at the Jail." These inmates immediately made serious threats against him. Alexander feared for his life, due to both the threats by his cellmates and his spiking blood pressure, which had already required treatment since he had arrived at the jail.

> **Later that evening**: Alexander informed guards of the threats and requested to be moved "multiple times." The guards refused. "Thinking he had no other option, he told [a] correctional officer . . . that he was suicidal, believing that would force the jail to move him out of the group detention cell for medical or mental health care evaluation."

> **Shortly after midnight, March 10**: Officers transferred Alexander to the "violent cell."[2] During the walk, guards

---

[2] The majority opinion observes that "Alexander was not transferred until he informed correctional officers that he was suicidal," which "alone implies that the officers took his statement at face value, even if they did not subjectively believe him." *Ante*, at 9. Drawing that inference at the pleading stage inverts Rule 12(b)(6): it assumes facts in favor of the moving party, not the plaintiff, which is precisely what the Rule forbids. *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 204 (5th Cir. 2013) (quoting *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010)). The opposite inference—one we are required to credit at this stage—is that the officers knew Alexander was not suicidal, understood that he was using the claim as a desperate attempt to escape a threatening environment, and chose to punish him for it. He had been in the group cell only a few hours, had repeatedly asked for protection, and had already been

repeatedly called him a "bitch." One said, "You really fucked up now, bitch."

**March 10–15**: While Alexander remained in the violent cell, guards taunted him with repeated insults and threats. On one occasion, they paraded a police dog outside his cell and loudly discussed taking Alexander into a field and unleashing the dog on him. They threatened to kill him using a "barbed wire guillotine." Just before he was released from the cell, one officer said: "Ronnie Alexander, you are not leaving this facility alive."

At this early stage, these allegations combined with their tight chronology plausibly support Alexander's allegation that the officers did not act to protect Alexander, but to punish him for complaining about his safety in group detention. The mental health evaluations showing no suicidal concerns, the guards' refusal to move him despite his clear fear for his safety, the retaliatory language during his transfer, and the continuing harassment while in the violent cell together present a coherent narrative of punitive intent. In the context of a pretrial detainee, "an inference that governmental intent was punitive is equivalent to an inference that the challenged condition is unconstitutional." *Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996).

Critically, none of these alleged facts appear in the district court's opinion. The court's analysis of the government's interest instead assumes Alexander was a known suicide risk. That assumption favors the defendants over the plaintiff, which is improper at the motion-to-dismiss stage. *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 256

_____

ignored. When he cried suicide, the officers responded not with concern but with hostility, using his plea as a convenient excuse to isolate and degrade him. That response does not reflect protective intent. It reflects retaliation.

No. 24-10663

(5th Cir. 2022) ("The court must accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff," not the defendant).

The majority opinion concedes that "[t]he district court did not consider these allegations." *Ante*, at 9 n.5. In other words, we agree the district court gave no consideration at all to these specific, non-conclusory allegations.[3] That should end the analysis. We are a "court of review, not first view." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 509 (5th Cir. 2021) (quoting *Cruson v. Nat'l Life Ins. Co.*, 954 F.3d 240, 249 n.7 (5th Cir. 2020)).

Undeterred, the majority opinion proceeds to reject Alexander's conditions-of-confinement claim as speculative, reasoning that he failed to allege an express admission of punitive intent or identify "other suicidal inmates [that] received different treatment." *Ante*, at 9–11. I do not follow. The question here is whether his allegations allow us to plausibly *infer* retaliatory or punitive conduct under the guise of suicide prevention. *See, e.g.*, *Simons v. Clemons*, 752 F.2d 1053, 1056 (5th Cir. 1985) (analyzing *Bell* and inquiring whether an "express intent to punish" could be "infer[red] . . . from the pleadings"); *Bell*, 441 U.S. at 538–39 (permitting courts to infer an intent to punish). As outlined above, they do. The majority's refusal to infer

---

[3] The majority opinion seems to suggest the district court was free to ignore these allegations because they are not "well-pleaded allegations of fact." *Ante*, at 9 n.5. It is difficult to see what, exactly, is not "well-pleaded" about an allegation that a jail official told Alexander, "You really fucked up now, bitch," or that another said, "Ronnie Alexander, you are not leaving this facility alive."

In the alternative, the majority dismisses "any threats directed at Alexander while he was in the violent cell" on the ground that they do "not creat[e] a condition of confinement," citing the general rule that "[m]ere allegations of verbal abuse do not present actionable claims under" 42 U.S.C. § 1983. *Ante*, at 10 & n.6 (quoting *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993)). Alexander does not make that argument. He cites the threats not as a standalone claim, but as circumstantial evidence of the officers' punitive intent.

anything about state of mind despite numerous explicit comments, defendants' associated conduct, and context (all at the motion to dismiss stage), if applied widely, would immunize numerous constitutional violations committed by all but the most proudly malicious defendants.

This case exemplifies that risk. If Alexander's allegations are true, then the jail violated the Fourteenth Amendment by using suicide protocols to punish a pretrial detainee—denying him a toilet, toilet paper, running water, recreation, bedding, clothing, and sufficient drinking water, while subjecting him to twenty-four-hour lighting and a cell contaminated with fecal matter and urine.[4] *Ante*, at 13 n.9 ("We have previously held that similar conditions violate the Eighth Amendment where there is punitive intent." (first citing *McCray v. Sullivan*, 509 F.2d 1332, 1336 (5th Cir. 1975); and then citing *Alexander v. Tippah County*, 351 F.3d 626, 628–31 (5th Cir. 2003))).[5]

―――――――――――――――

[4] My reading of the record diverges from the majority opinion, which discounts Alexander's allegation—"that '[t]he [cell's] floor had not been cleaned and was covered in dried urine and fecal matter'"—based on a color image showing an "off-white" cell that "appears clean" and "certainly devoid of fecal matter." *Ante*, at 3 n.2. First, that is not the full allegation. Alexander also alleges that fecal matter and urine were present in the drain located at the center of the cell floor, and that he had to manually force the feces through the grates using a paper cup. He further alleges that the floor was soiled with dried waste left by prior inmates housed in the toilet-less cell.

Second, although the complaint includes two photos of the cell, they are blurry. I cannot say they either support or contradict Alexander's account. Given the ambiguity, this case does not fall within the narrow exception recognized in *Scott v. Harris*, 550 U.S. 372, 380 (2007), which permits a court to disregard a plaintiff's version of events only when it is "so utterly discredited by the record that no reasonable jury could have believed him." "*Scott* was an exceptional case with an extremely limited holding," inapplicable to ambiguous photo evidence. *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021).

[5] *McCray* and *Alexander* involved convicted individuals and were analyzed under the Eighth Amendment. By contrast, Alexander was a pretrial detainee, so his claims arise under the Fourteenth Amendment. Still, we may look to those cases for guidance because a pretrial detainee's due process rights are said to be "at least as great as the Eighth

No. 24-10663

The majority opinion rejects Alexander's claim partly out of a policy concern for placing jailers in an untenable position: liable whether they act or refrain. *Ante*, at 10–11. The allegations in the present case fall within neither horn of that dilemma. Taking Alexander's allegations as true, the officers knew he was not suicidal, knew he feared for his safety in his group housing, and deliberately chose a punitive response that exposed him to new risks. This is not a matter of difficult judgment; it is punishment of a pretrial detainee disguised as suicide watch. The Constitution forbids that. *Bell*, 441 U.S. at 535.

## II

That leaves the claims focusing on medical care. The district court never addressed Alexander's claims that the jail provided constitutionally deficient mental health care. *Ante*, at 16 n.12 (majority opinion agreeing that these particular claims were not "fully considered"). By disposing of the issue without explanation, the court effectively dismissed the claims *sub silentio*, undermining meaningful appellate review. *See, e.g.*, *McInrow v. Harris County*, 878 F.2d 835, 836 (5th Cir. 1989). While Federal Rule of Civil Procedure 12 does not require findings of fact or conclusions of law, the parties are still entitled to understand the basis for final judgment. *Hanson v. Aetna Life & Cas.*, 625 F.2d 573, 575 (5th Cir. 1980). As we have stressed, "discussion by the trial judge" is often essential to facilitate proper review. *Myers v. Gulf Oil Corp.*, 731 F.2d 281, 283 (5th Cir. 1984). That is especially true where, as here, the record does not reveal which of several theories the district court may have relied on. *Mosley v. Ogden Marine, Inc.*, 480 F.2d 1226 (5th Cir. 1973). When a court's reasoning is either vague or absent, effective

---

Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

appellate review becomes all but impossible. *McInrow*, 878 F.2d at 836. In those circumstances, we have consistently remanded to obtain at least some explanation of the district court's rationale. *See, e.g.*, *Myers*, 731 F.2d at 284.

The majority opinion devotes seven pages to analyzing the medical care claims. *Ante*, at 15–22. Yet it cites no analysis from the district court. None exists. Instead, the majority opinion relies on the principle that we may affirm on any ground supported by the record, even one not reached by the district court, if the argument was raised below. *Id.* at 16 n.12 (citing *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014)). But that principle applies only when the district court has actually considered the claim. Although Alexander's mental health care claims were raised and briefed, the district court gave them no consideration. Vacatur and remand are warranted. *Ashley v. Clay County*, 125 F.4th 654, 662 n.5 (5th Cir. 2025) ("It is not our role to address a question that the district court left unresolved . . . as both a matter of judicial restraint and sound policy.").

As the prison-law scholars well explain, the majority opinion is incorrect in any event:

> Pretrial detainees are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 642 (5th Cir. 1996). A jail official violates this constitutional protection when deliberately indifferent to a pretrial detainee's serious medical needs. *Id.* The test applies equally to mental health issues as to physical ones. *Id.* Deliberate indifference requires that a jail official subjectively "knows of and disregards an excessive risk" to health or safety. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *see, e.g.*, *Easter v. Powell*, 467 F.3d 459, 464–65 (5th Cir. 2006) (holding that there was an Eighth Amendment liability where the prison nurse offered non treatment options to a patient with a history of cardiac problems who was experiencing chest pains). A jail

No. 24-10663

official's knowledge of a substantial risk of harm can be inferred if the health risk is obvious. *Farmer*, 511 U.S. at 842 n.8.

The panel majority fails to state or apply this black letter standard to the County. Instead, the majority simply holds that the County provided mental health assistance through "protection from violence or suicide" without considering whether Alexander had a serious medical need or whether the County was deliberately indifferent to it by failing to have any qualified mental health staff present. *Ante*, at 18. The majority says that Alexander failed to demonstrate that the County's "mental health treatment plan" was constitutionally inadequate, *id.* at 19, yet acknowledges that Alexander plausibly alleged a "total, intentional deprivation of qualified mental health care," *id.* at 15. An entirely unqualified person conducting a fleeting interview with Alexander more than two days after Alexander was placed in isolation cannot constitute a treatment plan. *See Gates v. Cook*, 376 F.3d 323, 336 (5th Cir. 2004). The majority errs too in applying this standard to Phlips herself by considering only what she did not do—move Alexander out of the suicide cell—rather than on what she did do: nothing. *Ante*, at 18; *see Gates*, 376 F.3d at 336.

App. at 4–5 (citation modified).

Alexander's allegations establish a plausible claim that the jail provided constitutionally deficient mental health care, and I would therefore vacate the district court's dismissal and remand for further proceedings.

## III

Ultimately, the majority opinion "decline[s] to . . . require officers and mental health providers to second-guess inmates' disclosure of suicidal ideation." *Ante*, at 22–23. That is not the rule Alexander seeks. He does not argue that officials must second-guess every report of suicidal ideation. Rather, he alleges that, in his case, the officials knew he was not suicidal and used suicide protocols as a method of punishment. I am deeply concerned

No. 24-10663

that the majority's decision creates an untenable exception to *Bell*, permitting jailers to punish detainees under the guise of suicide prevention, so long as they offer even the thinnest pretext, despite substantial evidence of punitive intent.

I respectfully dissent.

**No. 24-10663**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

RONNIE ALEXANDER,

Plaintiff–Appellant,

v.

PHILIP R. TAFT PSY D AND ASSOCIATES, P.L.L.C.; HENDERSON COUNTY TEXAS; NATHANIEL PATTERSON; TAYLOR CALDWELL; MORGAN FAIN; NOAH KREIE; WILLIAM TRUSSEL; DORA MARTINEZ; MELISSA HARMON; PHILIP TAFT,

Defendants–Appellees.

On Appeal from a Final Judgment of the
United States District Court for the Northern District of Texas
Case No. 3:22-cv-395, Hon. Brantley Starr

## BRIEF OF PRISON LAW SCHOLARS AS AMICI CURIAE SUPPORTING APPELLANT AND REHEARING

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW Front 1
#33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for *Amici*

August 14, 2025

## CERTIFICATE OF INTERESTED PERSONS

In addition to the persons described in the Parties' certificates of interested persons, the following listed persons have an interest in the outcome of this case within the meaning of Rule 28.2.1:

Bakhshay, Shirin, *Amicus*

Dangaran, D, *Amicus*

Davy, Jim, *Amici*'s counsel

Fenster, Mark, *Amicus*

Godfrey, Nicole, *Amicus*

Godsoe, Cynthia, *Amicus*

Jefferis, Danielle, *Amicus*

Weiss, Samuel, *Amici*'s counsel and *Amicus*.

# TABLE OF CONTENTS

**Page(s)**

Certificate of Interested Persons ................................................................ ii

Table of Authorities ................................................................................... iii

Introduction ................................................................................................. 1

Argument ..................................................................................................... 1

I.    The panel opinion makes basic errors of prison law. ........................ 1

    A.    The Court misdescribes the Fourteenth Amendment's due process inquiry. .......................................................................... 1

    B.    The opinion misstates the constitutional inquiry for deliberate indifference to a serious medical need. ........................................ 4

II.   In the context of prison law, the majority's concerns are unfounded, and the opinion will have considerable unintended consequences. .................... 5

    A.    The majority addresses hypothetical concerns that simply do not exist. ........................................................................................... 6

    B.    The majority conversely ignores the impossible burdens the opinion imposes on incarcerated litigants. .................................. 8

Conclusion................................................................................................... 10

Appendix of Amici Curiae ........................................................................ 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Wolfish,*
441 U.S. 520 (1979) ............................................................... 1, 2, 3

*Billman v. Ind. Dep't of Corr.,*
56 F.3d 785 (7th Cir. 1995) .......................................................... 9

*Brooks v. Warden,*
800 F.3d 1295 (11th Cir. 2015) ................................................... 3

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
489 U.S. 189 (1989) ..................................................................... 7

*DeSpain v. Uphoff,*
264 F.3d 965 (10th Cir. 2001) ..................................................... 3

*Easter v. Powell,*
467 F.3d 459 (5th Cir. 2006) ....................................................... 4

*Edwards v. Arocho,*
125 F.4th 336 (2d Cir. 2024) ....................................................... 2

*Estelle v. Gamble,*
429 U.S. 97 (1976) .................................................................... 4, 6

*Farmer v. Brennan,*
511 U.S. 825 (1994) .............................................................. 4, 7, 9

*Gates v. Cook,*
376 F.3d 323 (5th Cir. 2004) ................................................... 3, 5

*Hare v. City of Corinth, Miss.,*
74 F.3d 633 (5th Cir. 1996) ......................................................... 4

*Horvath v. City of Leander,*
946 F.3d 787 (5th Cir. 2020) ....................................................... 7

*J.H. v. Williamson County,*
951 F.3d 709 (6th Cir. 2020) ....................................................... 2

*Johnson v. Johnson,*
385 F.3d 503 (5th Cir. 2004) ....................................................... 8

*Jones v. Bock,*
549 U.S. 199 (2007) ..................................................................... 8

*LaReau v. MacDougall,*
473 F.2d 974 (2d Cir. 1972).......................................................... 3

*Littlefield v. Deland,*
641 F.2d 729 (10th Cir. 1981) ..................................................... 2

*May v. Sheahan,*
226 F.3d 876 (7th Cir. 2000) ....................................................... 2

*McKeithan v. Jones,*
212 F. App'x 129 (3d Cir. 2007) (per curiam)............................. 9

*Morris v. Zefferi,*
601 F.3d 805 (8th Cir. 2010) ....................................................... 2

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Naranjo v. Thompson,*
809 F.3d 793 (5th Cir. 2015) .................................................................. 9

*Sims v. Griffin,*
35 F.4th 945 (5th Cir. 2022)................................................................... 10

*Stevenson v. Tocé,*
113 F.4th 494 (5th Cir. 2024)................................................................. 10

*Taylor v. Riojas,*
592 U.S. 7 (2020) ...................................................................................... 4

*Whitley v. Albers,*
475 U.S. 312 (1986) ................................................................................. 7

*Williamson v. Stirling,*
912 F.3d 154 (4th Cir. 2018) .................................................................. 2

*Young v. Quinlan,*
960 F.2d 351 (3d Cir. 1992).................................................................... 3

*Zadeh* v. *Robinson,*
928 F.3d 457 (5th Cir. 2019) .................................................................. 7

*Ziglar* v. *Abassi,*
137 S.Ct. 1843 (2017) .............................................................................. 7

**Other Authorities**

Institute for Justice, *Results: Who wins qualified immunity cases, and how often do courts grant or deny qualified immunity?* ............................................... 8

**Rules**

Fed. R. Civ. P. 26(a)(1)(B)(iv)................................................................. 9

## INTERESTS OF THE AMICI CURIAE

*Amici* are professors of law who study, teach, and write about prison and jail litigation. They submit this brief to share their views on the substance of prison law and the practical realities of prisoner litigation. A full list of signatories appears as an appendix.

## INTRODUCTION

*Amici* urge the panel to rehear this opinion, or at minimum reissue it as unpublished. It makes basic errors of prison law—both doctrinal and in assessing the context and incentives of prison civil rights litigation. If applied widely, it would immunize unconstitutional conduct across the Circuit.

## ARGUMENT

### I. The panel opinion makes basic errors of prison law.

#### A. The Court misdescribes the Fourteenth Amendment's due process inquiry.

Pretrial detainees cannot be "punished." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In *Bell*, the Court explained that a pretrial detainee's conditions of confinement can constitute punishment either because of a jail's "expressed intent to punish" or an inferred one. 441 U.S. at 538–39. The latter inquiry examines (1) "whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and [(2)] whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* at 538 (cleaned up). In short, conditions must advance a legitimate goal and cannot be excessively harsh in doing so. *Id.* at 548.

1

In *Bell*, the Court described the importance of step two of this test by giving an outlandish example: "loading a detainee with chains and shackles and throwing him in a dungeon." *Id.* Doing so "may ensure his presence at trial and preserve the security of the institution" but would nonetheless "support a conclusion that the purpose for which they were imposed was to punish." *Id.* The Court thus warned that absent a proportionality requirement, jails would have undue leeway to impose harsh conditions of confinement for purposes of punishment but escape liability because the conditions had some connection to a legitimate goal of pretrial detention. *Id.*

Circuit courts regularly apply *Bell*'s proportionality test to infer a purpose to punish in violation of the Fourteenth Amendment. *Morris v. Zefferi*, 601 F.3d 805, 811 (8th Cir. 2010) (holding that transporting a pretrial detainee "in a small, unsanitary dog cage for the ninety-minute drive … with no compelling urgency and other options available, was excessive in relation to the goal of preventing escape, and thus, an inference may reasonably be made" that the conditions constituted punishment); *see also Williamson v. Stirling*, 912 F.3d 154, 179 (4th Cir. 2018); *Edwards v. Arocho*, 125 F.4th 336, 352–53 (2d Cir. 2024); *J.H. v. Williamson County*, 951 F.3d 709, 718 (6th Cir. 2020); *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000); *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981). In a case like *Morris*, the jail had a legitimate objective in maintaining security during transportation, and placing the detainee in a urine-soaked dog cage advanced that objective—only *Bell*'s proportionality test supports the obvious conclusion that doing so nonetheless constituted punishment.

2

Here, the panel majority initially described *Bell*'s test correctly but then simply omitted the proportionality requirement in its analysis. Slip Op. at 6, 7-8. The majority explained that Alexander must demonstrate the jail's restrictions were "not reasonably related to a legitimate governmental objective," and then provided examples of legitimate objectives related to preventing self-harm. *Id.* at 8, 11-12. This analysis, however, only addressed the first prong of *Bell*. 441 U.S. at 538. The Court failed to address whether these restrictions were excessive in relation to that purpose. Slip Op. at 6; *see* 441 U.S. at 538.

In abandoning *Bell*'s proportionality analysis, the majority failed to engage with the specific harsh conditions that form the basis for a Fourteenth Amendment claim under *Bell*. Slip Op. at 6; *see* 441 U.S. at 538. A great weight of caselaw holds that it is excessive in relation to any penological purpose to expose prisoners to feces. *See, e.g., Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004); *Brooks v. Warden*, 800 F.3d 1295, 1303–04 (11th Cir. 2015); *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972). Here, Alexander not only lived in his waste for five days, but developed infections in his feet from exposure to urine and fecal matter—allegations that the Court not only failed to apply in step two of the *Bell* analysis but ignored entirely. Slip Op. at 6; ROA.114 ¶40.

Similarly, while the majority insisted that Alexander's case was "a far cry from the horrifying facts" of *Taylor v. Riojas*, in which the U.S. Supreme Court summarily reversed this Court for failing to find a clearly established Eighth Amendment violation, much of the case is strikingly similar. Slip Op. at 12 n.8. Both cases involve

3

a man who was thrown naked into a filthy cell by taunting guards for five or six days because of a purported suicide threat. *Id.* at 1; *see Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020). Some of the facts from *Taylor* may indeed have been more "horrifying" than here, Slip Op. at 12 n.8, but whatever factual distinctions exist only even matter in step two of the *Bell* inquiry the majority skipped, because defendants in both cases had identical rationales for their similar behavior.

**B.    The opinion misstates the constitutional inquiry for deliberate indifference to a serious medical need.**

Pretrial detainees are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 642 (5th Cir. 1996). A jail official violates this constitutional protection when deliberately indifferent to a pretrial detainee's serious medical needs. *Id.* The test applies equally to mental health issues as to physical ones. *Hare*, 74 F.3d at 642. Deliberate indifference requires that a jail official subjectively "knows of and disregards an excessive risk" to health or safety. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *see e.g.*, *Easter v. Powell*, 467 F.3d 459, 464–65 (5th Cir. 2006) (holding that there was an Eighth Amendment liability where the prison nurse offered non treatment options to a patient with a history of cardiac problems who was experiencing chest pains). A jail official's knowledge of a substantial risk of harm can be inferred if the health risk is obvious. *Farmer*, 511 U.S. at 842 n.8.

The panel majority failed to state or apply this black letter standard to the County. Instead, the majority simply held that the County provided mental health assistance through "protection from violence or suicide" without considering whether Alexander

4

had a serious medical need or whether the County was deliberately indifferent to it by failing to have any qualified mental health staff present. Slip Op. at 15. The majority held that Alexander failed to demonstrate that the County's "mental health treatment plan" was constitutionally inadequate, but Alexander plausibly alleged a "total, intentional deprivation of qualified mental health care." Slip Op. at 19, 15. An entirely unqualified person conducting a fleeting interview with Alexander more than two days after Alexander was placed in isolation cannot constitute a treatment plan. ROA.114 ¶¶ 4, 99, 104, 107, 122–23; *see Gates*, 376 F.3d at 336. The Court erred too in applying this standard to Phlips herself when it considered only on what she did not do—move Alexander out of the suicide cell—rather than on what she did do: nothing. Slip Op. at 15; *see Gates*, 376 F.3d at 336.

## II.    In the context of prison law, the majority's concerns are unfounded, and the opinion will have considerable unintended consequences.

The panel majority expresses concern that allowing Mr. Alexander's claim to proceed would create a "minefield" for correctional defendants. Slip Op. at 11. That concern is misplaced. The structures of prison law and the PLRA, including high substantive standards that *pro se* incarcerated litigants cannot marshal evidence to meet and the judge-made doctrine of qualified immunity, already prevent prisoners from redressing many constitutional violations. Additionally, those difficult substantive standards incorporating the subjective state-of-mind of correctional defendants means that prisoners rely even more than other litigants on inferences from allegations and record evidence. Officers rarely state their sadistic or malicious intent explicitly—courts must infer it from context. The majority's misplaced concern

about prison defendants' hypothetical liability overrides incarcerated peoples' entitlement to reasonable inferences, and unfairly bars them from proving already-difficult claims.

### A. The majority addresses hypothetical concerns that simply do not exist.

The majority fears reading too much into "vulgar comments," Slip Op. at 9, "inappropriate" statements, Slip Op. at 10, or even "threats directed at Alexander," *id.* It worries that inferring malicious intent on the part of officers who, for example, "threaten[ed] to kill [Alexander] with a barbed wire guillotine" and told him not to expect to "leave this facility alive," *id.* at 10 n.6, would actually "result in the denial of constitutional protections" *to incarcerated people. Id.* at 11. That worry is backwards. Prison civil rights law already provides more-than-sufficient protection to officers, obviating any need to undercut Rule 12(b)(6) inferential standards.

First, the substantive standards in prison civil rights cases are already often very high. Substantive claims under the Eighth Amendment include a "subjective" prong that requires plaintiffs to show high *mens rea* on the part of correctional defendants.[1] As noted, claims for inadequate medical care require deliberate indifference, meaning that a defendant knew—not should have known, but actually knew—of a substantial risk of serious harm and intentionally disregarded it. *Farmer*, 511 U.S. at 842-43. Eighth Amendment claims for excessive force similarly require subjective intent to

---

[1] Pretrial detention claims arise under the Fourteenth Amendment but this Court has held that Eighth Amendment standards apply in most contexts. *See Crandel v. Hall*, 75 F.4th 537, 544 (5th Cir. 2023).

cause harm on the part of an officer—so even objectively unreasonable and seriously injurious uses of force may not trigger liability without "wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Because of the duty that the constitution imposes upon the State to "assume some responsibility for [the] safety and general well-being" of someone in its custody, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989), corrections officials cannot disregard a risk of substantial harm to an incarcerated person. *Farmer*, 511 U.S. at 842-43. But an incarcerated plaintiff must show not only that the defendant had knowledge "of the facts from which the inference could be drawn that a substantial risk of harm exists," but that the official did in fact "draw the inference" and consciously disregard the risk. *Id.* at 837, 842. Other common prison civil rights claims, like First Amendment retaliation, look to the state of mind of the defendant also. As claims brought by prisoners require demanding proof of a defendant's state of mind, the standards themselves already shield all but the most malicious defendants.

Second, prison officials benefit from the atextual, judge-made doctrine of qualified immunity. Several judges of this court have explained that, "Nothing in the text of § 1983—either as originally enacted in 1871 or as it is codified today—supports the imposition of the 'clearly established' requirement." *Horvath* v. *City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., concurring the judgment and dissenting in part); *Zadeh* v. *Robinson*, 928 F.3d 457, 480 (5th Cir. 2019) (Willet, J., concurring in part and dissenting in part) (discussing growing calls to reform qualified immunity). And the Supreme Court might well reform it. *See Ziglar* v. *Abassi*, 137 S.Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring the judgment) ("In an

7

appropriate case, we should reconsider our qualified immunity jurisprudence."). Until the Court does, however, qualified immunity protects officers who violate rights every day. *See* Institute for Justice, *Results: Who wins qualified immunity cases, and how often do courts grant or deny qualified immunity?* (listing 5th Circuit as denying qualified immunity in only 16% of appeals). Correctly applying Rule 12 to Alexander's allegations will not put jail officials between a rock and a hard place with liability, as all of prison law is structured to only create liability for significant misconduct.

### B.  The majority ignores the impossible burdens the opinion imposes on incarcerated litigants.

Prisoners, more than most litigants, depend on fairly-construed inferences at the motion to dismiss and summary judgment stages because of the difficult substantive standards with subjective elements that they must prove to win their claims. The PLRA, court procedures, and other features of litigation specific to *pro se* incarcerated litigants—including limits on the sorts of discovery that would allow them to obtain state-of-mind information from defendants—pose obstacles independent of and exacerbating the onerous substantive standards. Declining to give incarcerated litigants reasonable inferences risks immunizing entire categories of unconstitutional conduct in prisons and jails across the Circuit.

Aside from the difficult substantive standards, the PLRA prevents many meritorious cases outright. Many never make it to court at all because prisons set their own exhaustion rules, *Jones v. Bock*, 549 U.S. 199, 218 (2007), and often design onerous exhaustion regimes, *see, e.g.*, *Johnson v. Johnson*, 385 F.3d 503, 519 (5th Cir. 2004) (holding that a prisoner could sue about only some sexual assaults among

8

many, based on the grievance time limit). Prisoners cannot easily investigate their claims prior to filing because their facility has a monopoly on information about defendants' identities and most relevant facts. *See, e.g.*, *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 789 (7th Cir. 1995) ("Billman is a prison inmate. His opportunities for conducting a precomplaint inquiry are, we assume, virtually nil."). When prisoners *do* file, they cannot get those facts in discovery, either. They are not entitled to initial disclosures, Fed. R. Civ. P. 26(a)(1)(B)(iv), are often barred from receiving information because of security concerns, *Naranjo v. Thompson*, 809 F.3d 793, 798 (5th Cir. 2015) (explaining that plaintiff "was barred from viewing and responding to discovery that defendants had filed under seal"), and typically do not get to take depositions of correctional defendants without court intervention. *See, e.g.*, *McKeithan v. Jones*, 212 F. App'x 129, 131 (3d Cir. 2007) (per curiam) (rejecting plaintiff's request for an oral deposition, calling it "unorthodox"). And not getting discovery—particularly not getting to question defendants—imposes a unique burden on *pro se* incarcerated litigants who must show defendants' subjective state of mind as part of their claims.

Absent robust discovery, proving correctional defendants' subjective state-of-mind depends on reasonable inferences. The Supreme Court itself has acknowledged this in its seminal cases addressing the difficult substantive standards. *Farmer*, for example, noted that plaintiffs could provide knowledge of a substantial risk of harm through either direct or circumstantial evidence—i.e. evidence from which one can draw inferences about state of mind. *Farmer*, 511 U.S. 837, 842. Most circuits, including this one, draw inferences about subjective knowledge of a substantial risk of harm based upon the obviousness of a serious medical need—because most

9

defendants deny having knowledge. *Sims v. Griffin*, 35 F.4th 945, 949-50 (5th Cir. 2022) (denying summary judgment because of fact dispute over inference about clarity of need for treatment); *see also Stevenson v. Tocé*, 113 F.4th 494 (5th Cir. 2024). The majority's refusal to infer anything about state of mind despite numerous explicit comments, defendants' associated conduct, and context—all at the motion to dismiss stage—if applied widely, would immunize numerous constitutional violations committed by all but the most proudly malicious defendants.

## CONCLUSION

The panel should rehear this case, or, at least, withdraw it and issue it as an unpublished decision.

Respectfully submitted,

<div style="float:right">/s/ Samuel Weiss</div>

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street NW Front 1
#33821
Washington, DC 20033
(202) 455-4399
sam@rightsbehindbars.org

Counsel for *Amici Curiae*

August 14, 2025

**CERTIFICATE OF COMPLIANCE**

In accordance with <mark>Federal Rule of Appellate Procedure 32(a)(7)(C)</mark>, I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains fewer than 2,600 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.99, set in Century Schoolbook font in 12-point; and

(iii) that this brief was scanned for viruses prior to submission.

/s/ Samuel Weiss

Samuel Weiss

## CERTIFICATE OF SERVICE

I certify that on August 14, 2025 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system. I further certify that this brief complies with Fifth Circuit Rule 25.2.13 regarding redactions.

/s/ Samuel Weiss

Sam Weiss

**APPENDIX**

## APPENDIX OF AMICI CURIAE

**Name of Amicus Curiae. The below sign in their personal capacities. Their affiliations are listed for purposes of identification only.**

- Bakhshay, Shirin. Assistant Professor of Law, UCLA School of Law.

- Dangaran, D. Assistant Professor of Law at the University of Hawaiʻi at Mānoa William S. Richardson School of Law.

- Fenster, Mark. Marshall M. Criser Eminent Scholar Chair in Electronic Communications and Administrative Law, Levin College of Law, University of Florida.

- Godfrey, Nicole. Assistant Professor of Law, Sturm College of Law, University of Denver.

- Godsoe, Cynthia. Professor of Law and Associate Dean for Research and Scholarship, Brooklyn Law School.

- Jefferis, Danielle. Schmid Professor for Excellence in Research, Assistant Professor of Law, University of Nebraska College of Law.

- Weiss, Samuel. Lecturer on Law at Harvard Law School where he teaches the course "Prison Law."